**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **FUE XIONG,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 19-CV-0456-CVE-JFJ** |
| | ) | |
| **MARGARET GREEN, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**OPINION AND ORDER**

Following remand from the United States Court of Appeals for the Tenth Circuit, this matter is before the Court on petitioner Fue Xiong's: (1) partially reinstated motion for relief from judgment under Federal Rule of Civil Procedure 60(b) (Dkt. # 56); (2) motion to supplement petitioner's post-remand brief (Dkt. # 83); (3) "notice to the Court of respondent's failure to file reply brief" (Dkt. # 84); and (4) motion for appointment of counsel (Dkt. # 89).

This Court previously denied in part and dismissed in part the Rule 60(b) motion, Mr. Xiong appealed, and the Tenth Circuit remanded with instructions for this Court to reconsider the need for an evidentiary hearing on Mr. Xiong's procedurally defaulted Sixth Amendment conflict-of-interest claim. Following the remand, the Court permitted limited expansion of the record and post-remand briefing so that it could adequately reconsider the need for an evidentiary hearing. The expanded record includes: Blia Moua's 2020 affidavit (Dkt. # 30-6); Pa Kou Xiong's 2020 affidavit (Dkt. # 30-7); Mr. Xiong's answers to the Court's interrogatories (Dkt. # 76); Pa Kou

Xiong's 2026 affidavit (Dkt. # 81, at 25-26); Mr. Xiong's 2026 affidavit (Dkt. # 81, at 27-28); and Blia Moua's 2026 affidavit (Dkt. # 83, at 5-7).[1]

Having carefully considered the record of state court proceedings, the record of federal habeas proceedings, the expanded record, the parties' post-remand briefs, and applicable law, the Court reaffirms its prior ruling that no defect warranting relief from judgment under Rule 60(b) occurred in this federal habeas proceeding when the Court failed to hold an evidentiary hearing on Mr. Xiong's procedurally defaulted conflict-of-interest claim because 28 U.S.C. § 2254(e)(2) barred his request for an evidentiary hearing. The Court therefore again denies Mr. Xiong's Rule 60(b) motion.

## I. Factual and procedural background[2]

In May 2014, Mr. Xiong fatally shot Terrence Valentine ("Mr. Valentine") in the parking lot of a Tulsa motel. Dkt. # 37, at 2-6.[3] The shooting occurred during a confrontation that ensued after Mr. Xiong's friends saw Mr. Valentine and his cousin, Larenz Valentine, speak to Mr. Xiong's wife, Blia Moua ("Ms. Moua") as she walked through the parking lot to her parked car.

---

[1] The Court considers the two 2020 affidavits that Mr. Xiong submitted with his amended petition as part of the expanded record because neither affidavit was presented in any state court proceeding. With his post-remand brief, Mr. Xiong also submitted three affidavits—from Thai Xiong, Blia Moua, and Duke Vang—that were signed in 2019. Dkt. # 81 at 31-36. The Court does not consider the 2019 affidavits as part of the expanded record because Mr. Xiong submitted these same affidavits with his application for postconviction relief and they are part of the state court record. Compare Dkt. # 35-5, at 46-52, with Dkt. # 81, at 31-36.

[2] In response to this Court's post-remand invitation to expand the record, respondent did not submit any materials. The Court includes facts in this section that are drawn from the expanded record and considers them undisputed for the limited purpose of reconsidering the need for an evidentiary hearing.

[3] Unless otherwise noted, all citations refer to the CM/ECF header pagination. In addition, all unpublished decisions herein are cited as persuasive authority. FED. R. APP. P. 32.1; 10th Cir. R. 32.1.

Id. The State of Oklahoma ("the state") charged Mr. Xiong with first-degree murder. Dkt. # 36-1, at 25.

On September 10, 2014, Ms. Moua and Mr. Xiong's sister, Pa Kou Xiong ("Ms. Xiong") met with two attorneys, John David Echols ("Mr. Echols") and Michael Manning ("Mr. Manning"), to hire them to represent Mr. Xiong. Dkt. # 81, at 25; Dkt. # 83, at 5.[4] During the meeting, Ms. Moua asked Mr. Manning if he was related to Mr. Valentine, and Mr. Manning said he was not. Dkt. # 83, at 5. That same day, after the meeting, Ms. Moua emailed Mr. Echols to confirm that Mr. Manning was not related to Mr. Valentine, and Mr. Echols responded that Mr. Manning was not related to Mr. Valentine. Id.; Dkt. # 30-6, at 1; Dkt. # 81, at 37-38.[5] Mr. Echols and Mr. Manning entered their appearances as Mr. Xiong's trial counsel on September 10, 2014. Dkt. # 36-1, at 57.

Mr. Xiong's case proceeded to a jury trial in February 2016. Dkt. # 30-1, at 1. At some point before the first day of trial, Ms. Moua and Ms. Xiong met with Mr. Echols and Mr. Manning.

---

[4] Ms. Moua's affidavits state that she and Ms. Xiong met with both attorneys on September 10, 2014. Dkt. # 30-6; Dkt. # 83. Ms. Xiong's affidavits do not mention a September 2014 meeting with both attorneys. Dkt. # 30-7, at 1; Dkt. # 81, at 25. Ms. Xiong states that her family hired Mr. Echols and that he "later associated" Mr. Manning as co-counsel. Dkt. # 81, at 25.

[5] Ms. Moua's email states: "I just want to make sure that mike manning is not related to the other party. I just want to make sure." Dkt. # 81, at 38 (email dated Sept. 10, 2014, 10:19 a.m.). Mr. Echols responded: "He is not." Id. at 37 (email dated September 10, 2014, 11:52 a.m.). Mr. Xiong did not suspect before or during trial that Mr. Manning might be related to Mr. Valentine, "never asked" either attorney about the relationship, and does not know why Ms. Moua asked his trial attorneys about the relationship. Dkt. # 76, at 4-5.

Dkt. # 83, at 5; Dkt. # 81, at 25; Dkt. # 30-6, at 1.[6] During this meeting, Mr. Manning disclosed that he had recently learned during a family gathering, where members of Mr. Valentine's family were present, that he and Mr. Valentine were related. Dkt. # 83, at 5; Dkt. # 81, at 25; Dkt. # 30-6, at 1; Dkt. # 30-7, at 1.[7] Ms. Xiong and Ms. Moua asked whether Mr. Manning could still represent Mr. Xiong. Dkt. # 30-7, at 1.[8] Mr. Echols and Mr. Manning told Ms. Moua and Ms. Xiong that Mr. Manning could represent Mr. Xiong. Dkt. # 83, at 5; Dkt. # 81, at 25; Dkt. # 30-6, at 1; Dkt. # 30-7, at 1.[9] Ms. Moua and Ms. Xiong did not tell Mr. Xiong about Mr. Manning's

---

[6] In her 2020 affidavit, Ms. Moua states the second meeting was on January 4, 2016, around 1:00 p.m. Dkt. # 30-6, at 1. In her 2026 affidavit, Ms. Moua states the second meeting occurred "a few days before [Mr.] Xiong's trial date of Monday, February 8, 2016." Dkt. # 83, at 5. Ms. Xiong's 2020 affidavit states the meeting occurred in 2015. Dkt. # 30-7, at 1. In her 2026 affidavit, Ms. Xiong states she does not recall the date of the meeting and states that it "occurred during the period of active representation in [her] brother's criminal case." Dkt. # 81, at 25.

[7] Ms. Moua states in her 2020 affidavit that Mr. Manning further disclosed that Mr. Xiong's case was mentioned at the family gathering and Mr. Valentine's family "told [Mr. Manning] that if [Mr. Xiong] was to get self-defense there was going to be consequences. They said to [Mr. Manning] that there would definitely be pushing and shoving." Dkt. # 30-6, at 1. Ms. Moua's 2026 affidavit also refers to "consequences" but states: "[Mr.] Manning stated that members of [Mr.] Valentine's family told him that if [Mr.] Xiong were to walk free from the murder charge, there would be consequences, including pushing and shoving directed at Fue Xiong's family." Dkt. # 83, at 5. Neither of Ms. Xiong's affidavits mentions Mr. Manning's statements regarding any of these consequences. Dkt. # 30-7; Dkt. # 81, at 25-26.

[8] Ms. Moua's 2020 affidavit states she "did not say anything" when Mr. Manning disclosed the relationship. Dkt. # 30-6, at 1. According to Ms. Xiong, she and Ms. Moua both inquired whether Mr. "Manning's relation to Mr. Valentine would interfere with him representing [Mr. Xiong] and [they] were assured that it would not." Dkt. # 30-7, at 1.

[9] Ms. Moua's 2020 affidavit states that Mr. Echols appeared "surprised and shocked" by Mr. Manning's disclosure that he was related to Mr. Valentine and that both attorneys "stated that it did not affect anything, and [Mr. Manning] would still be able to represent" Mr. Xiong. Dkt. # 30-6, at 1. In her 2026 affidavit, Ms. Moua recalls additional details of what was said after Mr. Manning disclosed his relationship to Mr. Valentine,

> Michael Manning apologized and stated that he had only recently discovered the relationship. Michael stated he can no longer represent Fue, but John Echols stated that Michael Manning could continue to represent Fue Xiong.

relationship to Mr. Valentine either before or during his trial. Dkt. # 76, at 5, 8; Dkt. # 81, at 25, 27. Neither Mr. Echols nor Mr. Manning told Mr. Xiong about Mr. Manning's relationship to Mr. Valentine. Dkt. # 76, at 4.

Mr. Xiong's defense against the first-degree murder charge was that he shot Mr. Valentine in self-defense after Mr. Valentine "attacked" him and held him in a "bear hug." Dkt. # 30-2, at 50-56; see also Dkt. # 30-4, at 57-63, 66-67; Dkt. # 30-5, at 12-13, 20-24. During opening statement, Mr. Manning told the jury that Ms. Moua would testify. Dkt. # 30-2, at 51-52, 55. During the state's case-in-chief, two witnesses—Larenz Valentine and Tommy Soung ("Mr. Soung")—testified that Mr. Xiong shot Mr. Valentine while the two were engaged in a physical struggle, and Mr. Soung testified that Mr. Xiong was the only person he saw with a weapon. Dkt. # 37, at 3-4. On cross-examination, Mr. Echols elicited testimony from Mr. Soung about the parking lot encounter between Ms. Moua and the Valentine cousins that occurred just before the shooting. Dkt. # 30-2, at 276-78.

A third state witness, Shayn McCleary ("Mr. McCleary"), who was staying at the motel and not affiliated with anyone involved in the shooting, testified on direct examination that he woke up to the sound of gunshots and "saw a gentleman fall and two guys fighting around him, and then at that time the guys quit fighting and ran off." Dkt. # 30-2, at 181-82, 187, 197. On cross-examination by Mr. Manning, Mr. McCleary testified that he heard gunshots, woke up, "looked down" to the dark parking lot, saw "sparks" that he recognized as gunfire, and saw the

---

> Michael Manning asked John Echols to confirm whether he could continue to represent Fue Xiong, including during trial. John Echols stated that he would visit Fue Xiong, explain everything to him, and obtain Fue Xiong's signature on a legal form acknowledging that Michael Manning was related to the deceased and that Fue Xiong agreed to continue representation.

Dkt. # 83, at 5.

shooter standing about ten to fifteen feet away from the victim during the shooting. Id. at 191-94. After eliciting this testimony, Mr. Manning inquired further as to Mr. McCleary's testimony about the distance between the shooter and the victim. In response to several questions from Mr. Manning, Mr. McCleary testified he had not included information about the distance between the shooter and the victim in the written statement that he gave to a police officer on the night of the shooting. Id. at 193-96. Mr. McCleary testified on recross-examination by Mr. Manning that the victim was standing up when he was shot. Id. at 198-99.[10]

After the state rested, Mr. Echols informed the trial court that they had "three witnesses that [were] ready to go." Dkt. # 30-3, at 295, 304. The defense presented only two: Mr. Soung and Detective Terrence Joseph Campbell. Id. at 3. During Mr. Manning's direct examination of Mr. Soung, he asked Mr. Soung to identify Ms. Moua, who was "standing in the gallery," and Mr. Soung did so. Id. at 305-06. The defense did not call Ms. Moua as a witness, and Mr. Xiong waived his right to testify. Id. at 3; Dkt. # 30-4, at 4-12. The jury was instructed on self-defense. Dkt. # 37, at 10. Throughout closing argument, Mr. Echols argued that Mr. Xiong shot Mr. Valentine in self-defense and, at one point, stated that Mr. Xiong "had a right to react with deadly force when he was attacked, and that's what he did." Id. at 61-63, 66-69, 73, 75-78. Mr. Echols

[10] On the first day of trial, after another state witness identified several individuals who were at the motel on the night of the shooting, a juror came forward during a court recess to inform the trial judge that she recognized the name of one of those individuals as her first cousin. Dkt. # 30-2, at 216-24. With Mr. Xiong present, the trial judge, the juror, both defense attorneys, and both prosecutors engaged in an extensive discussion of whether the juror's familial relationship to one of the individuals who was present at the motel but not involved in the altercation or shooting would prevent the juror from making an impartial decision. Id. at 224-33. Over the state's objection, which was based in part on the juror's statement that she had some concern that she might "get confronted by [the individual] or her family" following trial, the trial judge allowed the juror to serve. Id. During this discussion about the familial relationship between a juror and an individual who was present at the motel on the night of the shooting, neither Mr. Echols nor Mr. Manning told the trial judge that Mr. Manning had recently discovered and had recently disclosed to Mr. Xiong's wife and sister that he was related to the deceased victim, Mr. Valentine. Id.

referred to Ms. Moua's slight stature and argued that Mr. Xiong reasonably believed his wife was in danger when his friends reported that "some men had engaged her in conversation, harassed her, or . . . crept along in a car keeping pace with her as they continued to talk to her as she walked away." Dkt. # 30-4, at 57, 75-76. Mr. Echols also urged the jury to discount Mr. McCleary's testimony, arguing that his testimony about the victim being shot from a distance while standing was refuted by the medical examiner's testimony about the gunshot wounds and by the testimony of other witnesses, including Larenz Valentine and Mr. Soung. Id. at 68-69. In the state's final closing argument, the prosecutor argued, in part, that Mr. McCleary's testimony that he saw "the shooting happen at a distance," and "saw the other man getting beat up by four people" was "consistent' with Larenz Valentine's testimony. Id. at 92. The prosecutor further urged the jury to find that Mr. Xiong was the aggressor, arguing in part, that

> when [Mr.] Xiong went on the other side of that car and he was upset and he kept that pistol trained on him and he started firing, just like [Mr.] McCleary said several feet away; that at that point [Mr. Valentine] ducks and he rushes at that point, and that's exactly how he gets shot in the back, in the torso, like this. And he falls into [Mr.] Xiong, which is exactly what Larenz Valentine saw when he made it to the vehicle.

Id. at 100-01. During deliberations, the jury asked to see the transcript of testimony from Larenz Valentine and Mr. Soung. Id. at 113; Dkt. # 36-5, at 25. After consultation with counsel for both parties and without objection, the trial court denied that request. Dkt. # 30-4, at 113. The jury found Mr. Xiong guilty of first-degree murder and recommended a sentence of life with the possibility of parole, and the trial court sentenced him accordingly. Id. at 116; Dkt. # 30-5, at 44, 49. Mr. Xiong appealed, and the Oklahoma Court of Criminal Appeals ("OCCA") affirmed his judgment and sentence in May 2018. Dkt. ## 35-1, 35-4. Mr. Xiong did not seek a writ of certiorari in the United States Supreme Court. Dkt. # 1, at 1; Dkt. # 24, at 3. During his direct

appeal process, neither Ms. Moua nor Ms. Xiong told Mr. Xiong about Mr. Manning's relationship to Mr. Valentine. Dkt. # 76, at 5, 8; Dkt. # 81, at 27.

In August 2019, Mr. Xiong simultaneously filed a pro se application for postconviction relief in state district court and a pro se petition for writ of habeas corpus under 28 U.S.C. § 2254 in this court. Dkt. ## 1, 35-5. In the petition, Mr. Xiong identified twelve claims: five claims he had presented to the OCCA on direct appeal and seven claims from his application for postconviction relief. Dkt. # 1. Identifying his one-year statute of limitations for filing a timely federal habeas petition as August 15, 2019, and citing the need to exhaust available state remedies as to the latter seven claims,[11] Mr. Xiong immediately moved to stay the federal habeas proceeding.[12] Dkt. # 1, at 1-2; Dkt. # 3. The Court determined the petition was timely and, over respondent's objection, stayed the federal habeas proceeding pending the conclusion of Mr. Xiong's state postconviction proceedings. Dkt. ## 8, 16. The state district court denied Mr. Xiong's application for postconviction relief, he appealed, and the OCCA affirmed the state district court's order on March 6, 2020. Dkt. ## 35-7, 35-8. During his state postconviction proceeding,

---

[11] A state prisoner ordinarily has one year from the date his judgment becomes final to file a federal habeas petition. 28 U.S.C. § 2244(d)(1)(A); Gonzalez v. Thaler, 565 U.S. 132, 150 (2012). But before filing a federal habeas petition, a state prisoner must exhaust available state remedies by first presenting his federal claims in state court. 28 U.S.C. § 2254(b)(1)(A). Mr. Xiong explained his failure to exhaust state remedies as to seven claims as follows: "Petitioner did not directly appeal Grounds 5-12. However, Petitioner is exhausting these claims under 22 O.S. § 1080. The cause and prejudice is that appellate counsel was deficient for omitting Grounds 5-12." Dkt. # 1, at 21; see also id. at 22 (noting that if the state district court denied his application for postconviction relief, Mr. Xiong "will exercise his right to appeal the adverse ruling in accordance with Section V, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2011) 'Procedures for Appealing Final Judgement [sic] Under Post-Conviction Procedure Act'").

[12] Ms. Xiong signed and filed the petition and the motion to stay on Mr. Xiong's behalf. Dkt. ## 1, 3.

neither Ms. Xiong nor Ms. Moua told Mr. Xiong that Mr. Manning was related to Mr. Valentine. Dkt. # 76, at 5; Dkt. # 81, at 27.

On March 27, 2020, Mr. Xiong, appearing without counsel, notified this Court that his state postconviction proceedings had ended and he submitted copies of the following: briefs from his direct appeal; the OCCA's summary opinion from his direct appeal; his application for postconviction relief that included a motion for evidentiary hearing and four affidavits; the state's response to his application for postconviction relief; and the OCCA's order denying postconviction relief. Dkt. ## 17 and 17-1 through 17-10. Mr. Xiong asked the Court to lift the stay and sought leave to file an amended petition. See id. at 2 (stating that he "simultaneously submits a 'motion for leave to amend [his] initial § 2254 with exhausted claims' and submit a 'new' amended petition with ALL the claims"). The Court lifted the stay, noted that Mr. Xiong did not submit a proposed amended petition, construed his request "as seeking leave to file an amended [petition] so that he may present complete arguments on each of the twelve claims asserted in his original petition," found "no indication in [his] request that he [was] seeking leave to add new claims that either may not be exhausted or may not relate back to the original petition for purposes of timeliness," granted leave to amend, and gave him until May 21, 2020, to file an amended petition. Dkt. # 18.

"[A]round April or May 2020," Ms. Moua traveled to Oklahoma from California to visit Mr. Xiong in prison. Dkt. # 81, at 27; see also Dkt. # 76, at 5-6 (describing Ms. Moua's visit as occurring between March and August 2020); Dkt. # 83, at 5 (Ms. Moua's statement that she visited Mr. Xiong in prison "many years" "[a]fter the verdict"). During that visit, Ms. Moua told Mr. Xiong, for the first time, about Mr. Manning's pretrial disclosure of his relationship to Mr. Valentine. Dkt. # 81, at 27; Dkt. # 76, at 5-6; Dkt. # 83 at 5. Sometime after his visit with Ms. Moua, Mr. Xiong asked Ms. Xiong if "it was true that Ms. Moua and [Ms. Xiong] had previously

been informed of Mr. Manning's relationship with Mr. Valentine." Dkt. # 81, at 26. Ms. Xiong told Mr. Xiong "that [she and Ms. Moua] had been told during the earlier meeting with counsel and explained that [she and Ms. Moua] had relied on counsel's assurances that representation would continue and that there was no issue requiring further action on [their] part." Id.

Mr. Xiong immediately urged his family to hire an attorney, telling them that Mr. Manning's "conflict" was "a legal issue," and his family hired Blayne Armendariz ("Mr. Armendariz").[13] Dkt. # 81, at 27; Dkt. # 76, at 7. During his "first and only" visit with Mr. Armendariz before Mr. Xiong filed an amended petition, Mr. Xiong told Mr. Armendariz "what [he] learned about" Mr. Manning's "conflict." Dkt. # 81, at 27; Dkt. # 76, at 6-7. Mr. Armendariz told Mr. Xiong that "he would file it as newly discovered evidence in federal court because [Mr. Xiong] couldn't go back to state court." Dkt. # 81, at 27-28. Mr. Xiong "only talked to [Mr. Armendariz] via phone call about 2 or 3 more times briefly before [his amended] petition was filed." Id.

One day before the May 21, 2020, deadline to file an amended petition, Michael Sheddie Johnson ("Mr. Johnson"), appeared in this case as counsel of record for Mr. Xiong.[14] Dkt. # 19.

---

[13] Mr. Xiong states that urged his family to hire an attorney after his visit with Ms. Moua in April or May 2020. Dkt. # 81, at 27. In her 2026 affidavit, Ms. Xiong states that "[i]t was not until after the trial concluded, when the family was seeking an appellate lawyer, that Ms. Moua informed [Mr. Xiong] of Mr. Manning's relationship with the deceased." Dkt. # 81, at 26. It is not clear whether Ms. Xiong's statement about the search for an "appellate lawyer" refers to the family's search for an attorney to help Mr. Xiong pursue a conflict-of-interest claim.

[14] Some of Mr. Xiong's filings state that his family hired Mr. Armendariz to represent him and that he primarily communicated with Mr. Armendariz, while other filings refer to both Mr. Armendariz and Mr. Johnson as his "federal lawyers" and describe his communications with Mr. Johnson. Dkt. ## 39, 46, 81, 82, 89. To date, only Mr. Johnson has entered his appearance in this case. Dkt. # 19. To date, Mr. Johnson has not withdrawn as counsel of record. However, since February 2023, Mr. Xiong has submitted pro se filings. The Court's refers to Mr. Armendariz's actions and omissions as Mr. Xiong describes them.

The next day Mr. Johnson filed, and this Court granted, a motion requesting an additional sixty days to file an amended petition. Dkt. ## 20, 21. In that motion, Mr. Johnson stated that he had been "unable to meet with [Mr. Xiong] due to the Covid-19 restrictions" at the prison, that he had communicated with Mr. Xiong by phone, and that he needed more time to review the claims in the original petition and prepare an amended petition. Dkt. # 20. Mr. Johnson subsequently moved for an additional thirty-day extension. Dkt. # 22. In support of the second motion to extend the deadline, Mr. Johnson stated that he had been corresponding with Mr. Xiong via regular mail, that he had still been unable to meet with him in person "due to the Covid-19 restrictions" and related prison lock downs. Id. at 1-2. Mr. Johnson further stated that he had "received most of [Mr. Xiong's] claims of relief" and that Mr. Xiong was "mailing his final two grounds that he feels need to be addressed within his petition." Id. at 2. The Court granted the motion and extended the deadline to August 21, 2020. Dkt. # 23. Through Mr. Johnson, Mr. Xiong filed an amended petition on August 21, 2020, asserting six claims: four claims he had presented to the OCCA on direct appeal and had raised in his original petition, one claim he had presented to the OCCA on postconviction appeal and had raised in his original petition, and one claim he had not (and still has not) presented in any state court proceeding and had not raised in his original petition. Dkt. # 24.

Only Mr. Xiong's unexhausted, newly asserted claim is relevant following the remand. That claim asserted a violation of his Sixth Amendment right to counsel based on "newly discovered evidence" that Mr. Manning had a conflict of interest that adversely affected his

representation of Mr. Xiong because Mr. Manning was related to Mr. Valentine.[15] Dkt. # 24, at 15-16. In the counseled amended petition, Mr. Xiong presented that claim as follows:

> GROUND SIX:
>
> Trial Counsel's Family Relationship to the Victim rendered Mr. Manning Ineffective at trial on the Defendant's behalf.
>
> Sub-claims:
>
> (A)
>
> Trial Counsel proceeded with Representation without getting Informed Consent from Mr. Xiong.
>
> Mr. Manning represented Mr. Xiong at trial without disclosing that he was related to the victim in the case. Mr. Xiong's family were actively trying to aid Mr. Xiong while awaiting trial. On September 10, 2015, [Ms.] Moua, Mr. Xiong's wife, emailed Mr. Echols to inquire about the case and co-counsel Manning. Specifically, she asked if Mr. Manning was related to the deceased victim in the case. Mr. Echols replied that Mr. Manning was not related within two hours of her email. In late December of that year Ms. Moua was asked to come to the attorney's office to interview her for Mr. Xiong's trial. [On] January 4, 2016, Ms. Moua and [Ms. Xiong] arrived at the office. Mr. Echols had [Ms. Xiong] wait in the reception area while Ms. Moua went to meet with both attorneys. Mr. Echols, Mr. Manning and Ms. Moua conducted the interview in a private office. After the interview, [Ms. Xiong] was invited to join them in the office to discuss the case. During this conversation, Mr. Manning disclosed to Mr. Echols, Ms. Moua and [Ms. Xiong] that he had been to a family gathering where he discovered that he was related to the victim. Mr. Manning said that Mr. Xiong's case was brought up and the family informed him that if Mr. Xiong was given self-defense that there would be consequences, pushing and shoving. Mr. Xiong's sister asked if this would affect the case on the eve of trial. The attorneys assured both that it did not affect anything and that Mr. Manning would be able to represent Mr. Xiong at trial.
>
> Mr. Xiong was not present at this meeting. Nor did his family disclose what had been discussed. Ms. Moua relied on what she was told by the attorneys. Additionally, neither attorney had Mr. Xiong give written informed consent of the personal conflict that was present with Mr. Manning.

---

[15] See Cuyler v. Sullivan, 446 U.S. 335, 348 (1980) ("In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."); see also Mickens v. Taylor, 535 U.S. 162, 172 n.5 (2002) ("An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance.").

(B)

Mr. Manning's Ineffective Assistance during Trial prejudiced Mr. Xiong[.]

During opening statements, trial counsel made multiple promises of testimony that the jury would hear. Specifically, Mr. Manning promised the jury that they would hear from [Ms. Moua]. Tr. II at 50. The prosecution's opening statement inferred that the defense witnesses had told multiple stories to the authorities. There were six witnesses that trial counsel could have called during the trial to verify the events that took place of the night in question. Only one was called.

Tommy Soung was called to the stand by the state and defense counsel. On direct [examination of Mr. Soung], Mr. Manning only asked one question, if [Mr. Soung] could identify Mr. Xiong's wife. Mr. Manning never called [Ms. Moua] during the trial, or any of the other witnesses that were present the night in question. The testimony of these witnesses was vital in demonstrating Mr. Xiong's self-defense claim. [Ms.] Moua's testimony was crucial. She was the only witness that could testify to almost every interaction that occurred that evening. She could've testified to Mr. Xiong's state of mind upon arriving to the car, where he was going afterward[,] and the fear he had for the safety of his family. Most importantly, she witnessed the decedent attack Mr. Xiong.

The evidence at trial was weak and not overwhelming. Mr. Xiong was prejudiced by Mr. Manning's deficient performance [in] failing to investigate and present important testimony at trial. There is no question that had the jury been able to hear Ms. Moua and other witnesses testify to the facts that happened that night, there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different.

Finally, Mr. Manning['s] performance with state's witness Shayn McCleary fell far short of effective assistance of counsel. Mr. McCleary testified differently on cross examination with an embellished story. Mr. Manning failed to impeach the witness who had changed his story. It was different from anything that he had said prior to or during trial. The embellished story allowed the state to improve a new theory on closing. Mr. McCleary was now testifying to seeing the shooting, and that the shooter was at some distance. Tr. II at 191-195. Mr. Manning continued to have the witness repeat the fabrication, however; he never impeached or pointed out any inconsistencies in his testimony. This was fatal to the defense and only bolstered the State's accusation that this was not self-defense. The state's original theory in opening was that the victim was shot while in a headlock. The new testimony, invited by Mr. Manning, allowed the state to present a new alternative theory of a shooting that took place at a distance.

> Mr. Manning failed to get informed consent in writing prior to the trial from Mr. Xiong about the family relation he had with the victim. Mr. Manning['s] deficient performance at trial caused errors that were fatal to the outcome of the trial.
>
> Wherefore, in the interest of justice and pursuant to 28 U.S.C. 2254(d)(1)(2) a writ of habeas corpus should be issued, and Mr. Xiong respectfully prays and asks that a new trial be granted, or an evidentiary hearing be granted as [the] Court deems appropriate.

Dkt. # 24, at 15-16 (footnote omitted; alterations added).[16] Mr. Xiong stated in the counseled amended petition that the conflict-of-interest claim was based on "newly discovered evidence brought to counsel's attention," that the claim was "being presented for the first time," and that "Mr. Xiong will exhaust ground six in state court." Dkt. # 24, at 15 n.3, 16-17.[17]

Respondent responded to the amended petition on November 20, 2020. Dkt. # 35. Respondent urged the Court to deny relief on ground six for two reasons. First, respondent argued that the portions of ground six (1) alleging that Mr. Manning had a conflict of interest and (2) that Mr. Manning was ineffective for failing to impeach Mr. McCleary were unexhausted, should be deemed procedurally defaulted through application of an anticipatory procedural bar, and were not reviewable because Mr. Xiong did not make the showings necessary to overcome the procedural

[16] The facts that were provided in the amended petition to support ground six are drawn from Ms. Moua's and Ms. Xiong's 2020 affidavits. See Dkt. ## 30-6, 30-7. Ms. Moua's affidavit does not state whether or when she informed Mr. Xiong of Mr. Manning's relationship to Mr. Valentine. Dkt. # 30-6. Ms. Xiong's affidavit states that she knew about the relationship before trial but that "this information was not relayed to [Mr. Xiong]." Dkt. # 30-7, at 1. No allegations in the amended petition or the 2020 affidavits identified when or how Mr. Xiong first discovered the relationship, identified when he informed Mr. Johnson of this new claim, mentioned a meeting with Mr. Armendariz, or described any efforts Mr. Xiong took to discover the relationship before or during his trial, his direct appeal, or his state postconviction proceeding. Id. at 15-17.

[17] Mr. Xiong states that he asked to see the amended petition before it was filed, and Mr. Armendariz did not send him a copy of the amended petition "until about 2 months later after it was already filed." Dkt. # 76, at 7-8; see also Dkt. # 39, at 4 (alleging in motion to appeal out of time that Mr. Xiong did not receive copy of the amended petition until November 6, 2020).

bar.[18] Id. at 48-53. Second, respondent argued that the portion of ground six alleging that Mr. Manning was ineffective for failing to call Ms. Moua as a witness had been presented to the OCCA on postconviction appeal and that Mr. Xiong had not satisfied the preconditions to habeas relief set forth in 28 U.S.C. § 2254(d).[19] Mr. Xiong had until December 21, 2020, to file an optional reply brief. Dkt. # 34. He did not file one.[20]

In July 2022, this Court denied the amended petition without holding an evidentiary hearing, declined to issue a certificate of appealability, and entered judgment against Mr. Xiong. Dkt. ## 37, 38. As to ground six, the Court found that Mr. Xiong did not exhaust the conflict-of-interest claim. Dkt. # 37, at 21. The Court cited Mr. Xiong's concession in his counseled amended petition that he had not exhausted the conflict-of-interest claim, agreed with respondent's unopposed argument that the claim should be deemed procedurally defaulted, and found that Mr.

[18] "'Anticipatory procedural bar' occurs when the federal courts apply procedural bar to an unexhausted claim that would be procedurally barred under state law if the petitioner returned to state court to exhaust it." Anderson v. Sirmons, 476 F.3d 1131, 1139 n.7 (10th Cir. 2007) (quoting Moore v. Schoeman, 288 F.3d 1231, 1233 n. 3 (10th Cir. 2002)). To overcome an anticipatory procedural bar, a petitioner must show either "cause and prejudice" or "a fundamental miscarriage of justice." Wahpekeche v. Pettigrew, 169 F.4th 1176, 1187 (10th Cir. 2026) (citing Coleman v. Thompson, 501 U.S. 722, 750 (1991), holding modified by Martinez v. Ryan, 566 U.S. 1 (2012)).

[19] A federal court shall not grant habeas relief to a state prisoner on a federal claim that was adjudicated in state court unless the prisoner first shows that the state court's decision on that claim either (1) "was contrary to clearly established" Supreme Court precedent; (2) "involved an unreasonable application of clearly established" Supreme Court precedent; or (3) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2); Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

[20] Mr. Xiong states that Mr. Armendariz did not send him a copy of the response to the amended petition until two months after it was filed. Dkt. # 76, at 8; see also Dkt. # 39, at 4-5 (alleging in motion to appeal out of time that Mr. Armendariz sent Mr. Xiong a copy of the response on February 25, 2021, that Mr. Xiong did not receive it until April 22, 2021).

Xiong had not shown that he could overcome the procedural default. Id.[21] The Court found that Mr. Xiong had exhausted the portions of ground six alleging that Mr. Manning was ineffective for (1) not presenting certain witnesses, including Ms. Moua, and (2) not impeaching Mr. McCleary. Id. at 22-25. As to the exhausted portions of ground six, the Court found that § 2254(d) barred relief because Mr. Xiong had not shown that the OCCA's adjudication of his postconviction claim alleging that appellate counsel was ineffective for omitting a claim that Mr. Manning was ineffective for these two reasons resulted in a state court decision that was objectively unreasonable. Id. The Court did not address the cursory request for an evidentiary hearing that Mr. Xiong tacked on at the end of his argument in support of ground six. Id., generally.

In February 2023, Mr. Xiong filed an untimely notice of appeal, seeking review of the July 2022 order and judgment, and moved to reopen the time to appeal. Dkt. ## 39, 40.[22] This Court

---

[21] Mr. Xiong made no arguments in the amended petition suggesting that he could overcome a procedural default. Instead, he stated only that he would exhaust ground six. Despite the absence of any argument from Mr. Xiong to show that he could overcome the procedural default of this claim, this Court stated, in a footnote, that Mr. Xiong likely could not establish cause because Mr. Xiong's own allegations, taken as true, established that Ms. Moua and Ms. Xiong were "actively trying to aid" him before and during his trial and that Ms. Moua and Ms. Xiong met with Mr. Manning and Mr. Echols before trial and were present when Mr. Manning disclosed his relationship to Mr. Valentine. Dkt. # 37, at 22 n.8. The Court further noted that Ms. Xiong had assisted Mr. Xiong in filing his original petition for writ of habeas corpus. Id.

[22] In support of his request to reopen the time to appeal, Mr. Xiong alleged that after the OCCA denied his postconviction appeal in March 2020, he urged his family to hire an attorney; he met with Mr. Armendariz at Davis Correctional Facility in May 2020; Mr. Armendariz was hired to represent Mr. Xiong in June 2020; Mr. Xiong sent Mr. Armendariz "his own pro se hand written (not typed) petition of over 100 pages consisting of 12 proposition[s]" in July 2020; Mr. Armendariz informed him by phone in August 2020 that only six claims would be raised in the amended petition, and Mr. Xiong agreed with that approach; and when Mr. Xiong first received a copy of the amended petition from Mr. Armendariz in November 2020, Mr. Xiong was "disappointed" that it was only twelve pages long, that it omitted case law and supporting arguments that Mr. Xiong had included in the handwritten petition that he had sent to Mr. Armendariz, and that it had been filed by Mr. Johnson rather than Mr. Armendariz. Dkt. # 39. Mr. Xiong also alleged that neither attorney timely communicated with him about the denial of his amended petition. Id.

denied the motion, and the Tenth Circuit dismissed the untimely appeal (Case No. 23-5024). Dkt. ## 45, 51. Mr. Xiong filed a timely notice of appeal seeking review of the order denying his motion to reopen the time to appeal, and the Tenth Circuit dismissed the appeal (Case No. 23-5038). Dkt. ## 47, 63.

In August 2023, Mr. Xiong filed a Rule 60(b) motion seeking relief from the July 2022 judgment. Dkt. # 56. Relevant here, Mr. Xiong claimed: (1) that he "ha[d] in fact shown cause and prejudice for his failure to raise the [conflict-of-interest] claim in state court" because his trial attorneys "never informed" him of Mr. Manning's relationship to Mr. Valentine and that he did not learn of the relationship "until after his post-conviction"; (2) that this Court "did not acknowledge the fact that [he] properly requested" an evidentiary hearing, did not rule on that request, and thus "erroneously and unreasonably denied" the conflict-of-interest claim "as it could not had properly adjudicated on this claim without proper hearing as the issue consisted of facts and evidence that was not on the record"; and (3) erred in suggesting in a footnote that he could not show cause to overcome the procedural default based on "conjectures and speculations" that Ms. Moua's and Ms. Xiong's pretrial knowledge of Mr. Manning's relationship to Mr. Valentine could be imputed to Mr. Xiong when he had no personal knowledge of the relationship "until after his post-conviction." Dkt. # 56, at 23-27. Mr. Xiong described the failure to hold an evidentiary hearing as "a defect in the integrity of the federal habeas proceeding." Id. at 27-28. The Court

construed the Rule 60(b) motion, in part, as a "true" motion and denied it.[23] Dkt. # 61, at 3-9. The Court understood Mr. Xiong's arguments as asserting that the Court erred: (1) in determining that he procedurally defaulted the conflict-of-interest claim; (2) in determining that he had not shown he could overcome the procedural default; and (3) in denying relief without holding an evidentiary hearing so that he could develop facts to support that claim. Id. at 5-8. The Court rejected these arguments, reasoning that Mr. Xiong had not identified any circumstances that would support granting relief under Rule 60(b). Id. As to Mr. Xiong's complaint about the failure to hold an evidentiary hearing, the Court reasoned that it "did not make a mistake of law by declining to hold an evidentiary hearing as to the procedurally barred conflict-of-interest claim" because Mr. Xiong "necessarily failed to develop the factual basis of his claim in state court" when he did not raise that claim in any state court proceeding. Id. at 6-7; see 28 U.S.C. § 2254(e)(2) (barring evidentiary hearing if the petitioner "failed to develop the factual basis of a claim in State court proceedings" unless the petitioner can satisfy certain circumstances identified in statute). The Court denied a certificate of appealability and entered judgment against Mr. Xiong in May 2024. Dkt. ## 61, 62.

Mr. Xiong filed an untimely notice of appeal, seeking review of May 2024 judgment, and moved to reopen the time to appeal. Dkt. ## 66, 69. After the Tenth Circuit docketed Mr. Xiong's appeal (Case No. 24-5072), this Court granted Mr. Xiong's motion to reopen the time to appeal

[23] In the context of a habeas proceeding, a Rule 60(b) motion is a "'true' 60(b) motion if it either (1) challenges only a procedural ruling of the habeas court which precluded a merits determination of the habeas application . . . or (2) challenges a defect in the integrity of the federal habeas proceeding, provided that such a challenge does not itself lead inextricably to a merits-based attack on the disposition of a prior habeas petition." Spitznas v. Boone, 464 F.3d 1213, 1215-16 (10th Cir. 2006). In contrast, "a [Rule] 60(b) motion is a second or successive petition if it in substance or effect asserts or reasserts a federal basis for relief from the petitioner's underlying conviction." Id. at 1215.

and deemed the notice of appeal timely filed. Dkt. ## 68, 70. A circuit judge subsequently granted Mr. Xiong a certificate of appealability on one issue: "whether Mr. Xiong 'failed to develop the factual basis' of his conflict-of-interest claim within the meaning of 28 U.S.C. § 2254(e)(2), i.e., whether he was 'at fault' for the undeveloped record in state court, Williams v. Taylor, 529 U.S. 420, 432 (2000)." Dkt. # 71, at 2. The Tenth Circuit panel that considered the merits of Mr. Xiong's appeal described the "main issue" on appeal as one "involv[ing] the adequacy of [Mr. Xiong's] chance to develop the record in state court on an alleged conflict of interest." Dkt. # 72, at 1. The Tenth Circuit's decision on this issue states:

> The appeal grew out of a state-court conviction for first-degree murder. Challenging this conviction, the defendant claims a conflict of interest based on an alleged family relationship between his trial attorney and the victim. But the defendant allegedly didn't learn about the alleged relationship until after the trial.
>
> The trial resulted in a conviction, and the defendant unsuccessfully sought habeas relief in federal district court. The court rejected the habeas claim based on procedural default. The court recognized that the defendant could overcome procedural default through a showing of cause and prejudice. But the court concluded that the defendant couldn't show *cause* because his wife and sister had admittedly known about the family relationship before trial.
>
> The defendant moved to reopen the habeas proceedings, claiming in part that the federal district court should have conducted an evidentiary hearing. The court rejected this claim, reasoning that the defendant had failed to develop the factual basis of the claim when he was in state court. The defendant appeals this ruling.
>
> The government argues that the district court didn't need to provide an evidentiary hearing because the defendant hadn't asked for one. The government is incorrect because the defendant requested an evidentiary hearing in the habeas petition. R. vol. 1, at 212.
>
> Despite this request, the federal district court wouldn't need to provide an evidentiary hearing if the defendant failed to develop the claim in state court. See 28 U.S.C. § 2254(e)(2). But the court didn't say how the defendant would have been responsible for the failure to develop this claim. His wife and sister allegedly learned of the family relationship, but there's nothing to suggest that they told the defendant until after his post-conviction proceedings had ended. As a result, we are left without any meaningful evidence that the defendant had known about the family relationship prior to his conviction. We thus remand for the district court to

> reconsider the need for an evidentiary hearing. See Rule 8(a), Rules Governing Section 2254 Cases in the United States District Courts.

Dkt. # 72, at 1-3 (emphasis in original).

After the Tenth Circuit issued its mandate, this Court directed the Clerk of Court to reopen this case and to reinstate Mr. Xiong's Rule 60(b) motion "for the limited purpose of permitting this Court to . . . reconsider[] the need for an evidentiary hearing related to the procedurally defaulted conflict-of-interest claim." Dkt. # 75, at 2, 18. The Court emphasized "the limited scope of the issue before this Court on remand," explaining that the "Tenth Circuit's decision identifies the ruling central to Mr. Xiong's appeal as this Court's determination that § 2254(e)(2) barred his request for an evidentiary hearing on the conflict-of-interest claim and instructs this Court to 'reconsider the need for an evidentiary hearing.'" Id. at 12. The Court also noted that the Tenth Circuit's decision "did not purport to reverse or modify any other portion of this Court's order denying in part and dismissing in part Mr. Xiong's Rule 60(b) motion" and that that the May 2024 order and corresponding judgment therefore "remain in effect in all respects except as to this Court's determination that it 'did not make a mistake of law by declining to hold an evidentiary hearing as to the procedurally barred conflict-of-interest claim' because Mr. Xiong 'necessarily failed to develop the factual basis of his claim in state court' when he did not raise that claim in any state court proceeding." Id. at 12-13. Finally, the Court found that it could not "adequately reconsider the need for an evidentiary hearing without limited expansion of the record and further briefing" and thus: (1) directed Mr. Xiong to submit a notarized written statement answering ten interrogatories propounded by the Court; (2) directed both parties to simultaneously file post-remand briefs; (3) permitted both parties to submit with their briefs any additional materials, including affidavits, relevant to this Court's reconsideration of the need for an evidentiary hearing; and (4) directed Mr. Xiong to submit, if available, copies of any emails that Ms. Moua sent to or

received from Mr. Echols regarding her pretrial inquiry about Mr. Manning's alleged relationship to Mr. Valentine.[24] Id. at 15-19.

Mr. Xiong submitted written answers to the Court's interrogatories (Dkt. # 76), and both parties filed supplemental post-remand briefs (Dkt. ## 77, 81). With his post-remand brief, Mr. Xiong submitted six affidavits (Dkt. # 81 at 25-36)[25] and a copy of emails that Ms. Moua sent to and received from Mr. Echols in September 2014 (Dkt. # 81, at 37-38). Because the Court granted, over respondent's objection, Mr. Xiong's request for an extension of time to file his post-remand brief, the Court gave both parties the option to file a post-remand reply. Dkt. # 80. Mr. Xiong exercised that option (Dkt. # 82); respondent did not. After all post-remand briefing deadlines expired, Mr. Xiong moved to supplement his post-remand brief (Dkt. # 83), filed a "notice to the Court of respondent's failure to file reply brief" (Dkt. # 84), and moved for appointment of counsel (Dkt. # 89).

## II. Discussion

### A. Motion to supplement petitioner's post-remand brief (Dkt. # 83)

In his motion to supplement petitioner's post-remand brief, Mr. Xiong requests leave to substitute a signed, dated affidavit from Ms. Moua in place of the unsigned, undated affidavit that he submitted with his post-remand brief. Dkt. # 83; compare Dkt. # 81, at 29-30 (unsigned, undated affidavit), with Dkt. # 83, at 5-7 (signed, dated affidavit). Respondent did not respond to

---

[24] See Rule 7(a), (b), Rules Governing Section 2254 Cases in the United States District Courts ("Habeas Rule 7") (providing that the court "may direct the parties to expand the record by submitting additional materials" and describing the types of materials that may be required); Rule 8(a), Rules Governing Section 2254 Cases in the United States District Courts ("Habeas Rule 8") (providing that a court may consider "any materials submitted under [Habeas] Rule 7 to determine whether an evidentiary hearing is warranted").

[25] One affidavit, from Ms. Moua, was not signed or dated. Dkt. # 81, at 29-30.

this motion, and the affidavits are identical except for the missing date and signature on the copy that Mr. Xiong submitted with his post-remand brief. The Court therefore grants the motion to supplement and considers Ms. Moua's signed, dated affidavit as part of the expanded record.

**B. Notice to the Court of respondent's failure to file reply brief (Dkt. # 84)**

In his notice to the Court of respondent's failure to file reply brief, Mr. Xiong requests "summary judgment" and an "immediate writ relief to vacate [his] conviction or to grant new trial." Dkt. # 84, at 1-4. He appears to contend that respondent's failure to file a post-remand reply constitutes a concession that Mr. Xiong is entitled to federal habeas relief on his procedurally defaulted conflict-of-interest claim.[26] Id. To the extent this Court understands Mr. Xiong's arguments, the Court finds that he misunderstands this Court's order regarding post-remand replies and the limited scope of the remand. First, this Court did not require either party to file a post-remand reply. Dkt. # 80. Rather, as previously stated, this Court gave both parties the option to file a post-remand reply only because the Court granted, over respondent's objection, Mr. Xiong's request for an extension of time to file a post-remand brief after Mr. Xiong failed to comply with this Court's initial order establishing the same deadline for both parties to file post-remand briefs. Id. Put simply, respondent had the option to file a post-remand reply and chose not to exercise that option. Second and relatedly, nothing about respondent's choice to forgo filing an optional post-remand reply supports Mr. Xiong's requests for summary judgment, an immediate writ,

[26] Mr. Xiong asserts "that by remaining silent," respondent has effectively failed to dispute any of his factual allegations and has "waived [the] opportunity to contest" his conflict-of-interest claim. Dkt. # 84, at 2. He also asserts that because respondent does not challenge his factual allegations, "[t]here is no longer a factual dispute for the court to resolve" and an evidentiary hearing "would be a waste of judicial resources." Id. at 2. Finally, he suggests, as an alternative to scheduling an evidentiary hearing, counsel for respondent could find "that it's in the interest of justice" to "compromise with a favorable plea deal, as Petitioner has already been incarcerated for 12 years." Id. at 4.

vacation of his state criminal judgment, or a new trial. Critically, the Tenth Circuit's mandate instructs this Court to reconsider the need for an evidentiary hearing and, more precisely, to reconsider this Court's prior ruling that Mr. Xiong failed to develop the factual basis of his procedurally defaulted conflict-of-interest claim in state court. Dkt. ## 71, 72. The Court construes the "notice" as a motion for summary judgment and denies the motion because it wholly lacks merit.

### C. Motion for appointment of counsel (Dkt. # 89)

In his motion for appointment of counsel, Mr. Xiong asks this Court to appoint the Federal Public Defender to represent him. Dkt. # 89. Mr. Xiong acknowledges that post-remand briefing "is strictly concluded" but contends that appointment of counsel is necessary because:

> (1) "the issues remaining before this court are exceptionally complex, involving intersecting claims of a Sixth Amendment actual conflict of interest (supported by uncontradicted, notarized witness affidavit), Strickland ineffective assistance of counsel, and a Fourteenth Amendment Napue perjury violation by state actors";
>
> (2) he is "an indigent, incarcerated individual who has been abandoned by his previously retained habeas counsel" and he "is completely unable to effectively navigate the critical disposition phase of this litigation, manage out-of-state witness logistics, or evaluate potential settlement resolutions without professional legal representation"; and
>
> (3) "[u]nder 18 U.S.C. § 3006A(a)(2)(B), the 'interests of justice' clearly require that counsel be appointed for an indigent petitioner when the case has reached a complex turning point or where an evidentiary hearing may be required."

Dkt. # 89, at 2-3. None of these reasons is persuasive. Habeas petitioners have no constitutional right to counsel, but a federal court has discretion to appoint counsel for an indigent petitioner and must appoint counsel if it holds an evidentiary hearing. See Swazo v. Wyo. Dep't of Corr. State Penitentiary Warden, 23 F.3d 332, 333 (10th Cir. 1994); Habeas Rule 8(c). In determining whether to exercise discretion to appoint counsel, the court considers several factors relevant to the goal of ensuring a fair proceeding. See Toevs v. Reid, 685 F.3d 903, 916 (10th Cir. 2012) (discussing

factors). Similarly, 18 U.S.C. § 3006A(a)(2)(B) provides a court with discretion to appoint counsel for an indigent habeas petitioner if the court determines "that the interests of justice so require." Here, appointment of counsel is not necessary to ensure fairness and is not required by the interests of justice. Again, Mr. Xiong appears to misunderstand the limited scope of the remand. The issue presented is whether Mr. Xiong failed to develop the factual basis of the procedurally defaulted conflict-of-interest claim in state court. Dkt. ## 71, 72. Both parties have addressed this issue in post-remand briefing and both parties were provided an opportunity to submit materials relevant to this issue. As demonstrated by the record, Mr. Xiong briefed this issue by filing a post-remand brief and a post-remand reply and responded to this Court's requests for additional relevant materials by answering the Court's interrogatories and submitting evidence. He accomplished these tasks despite his status as an indigent prisoner and despite his alleged abandonment by habeas counsel whom, he says, he last spoke with in 2023 and whom, to date, has not withdrawn as counsel of record. Dkt. # 89 at 2.[27] Contrary to Mr. Xiong's position, appointment of counsel is not necessary to sort through complex or "intersecting claims." Dkt. # 89, at 2. Further, the Court finds, for the reasons discussed next, that there is no need for an evidentiary hearing and no basis to grant Mr. Xiong relief from the July 2022 judgment under Rule 60(b). Thus, Mr. Xiong's concerns about navigating the logistics of out-of-state witnesses and participating in potential settlement negotiations without the assistance of counsel are unfounded. For these reasons, the Court denies his request for appointment of counsel.

---

[27] In his motion for appointment of counsel, Mr. Xiong alleges he "last spoke to counsel in 2023 after counsel missed his habeas appeal deadline." Dkt. # 89, at 2. He further alleges that "during that visit [Mr.] Johnson advise[d] him to forget about his federal appeal, and to sit in prison for a few years, and that when laws change, counsel would revisit his case for free." Id. Mr. Xiong states that he and Mr. Johnson "got into a[n] argument and haven't been in contact since." Id.

**D. Rule 60(b) motion (Dkt. # 56)**

As previously discussed, Mr. Xiong appealed this Court's denial of his Rule 60(b) motion after this Court rejected his claim that a defect had occurred in this federal habeas proceeding when the Court did not hold an evidentiary hearing on his procedurally defaulted conflict-of-interest claim. Dkt. # 56, at 23-28; Dkt. # 61, at 6; Dkt. # 72, at 2-3. In its prior ruling, this Court applied 28 U.S.C. § 2254(e)(2), a statute that limits a federal court's discretion to hold evidentiary hearings when a state prisoner has "failed to develop the factual basis of a claim in State court proceedings." Dkt. # 61, at 6. The Court reasoned that because Mr. Xiong did not "raise the conflict-of-interest claim in any state court proceeding, [he] necessarily failed to develop the factual basis of his claim in state court and thus was not entitled to an evidentiary hearing as to that claim." Id. The issue on which Mr. Xiong obtained a certificate of appealability from the Tenth Circuit was "whether Mr. Xiong 'failed to develop the factual basis' of his conflict-of-interest claim within the meaning of 28 U.S.C. § 2254(e)(2), i.e., whether he was 'at fault' for the undeveloped record in state court." Dkt. # 71, at 2. As to that issue, the Tenth Circuit's primary concern in remanding this case appears to be that this Court "didn't say how [Mr. Xiong] would have been responsible for the failure to develop this claim" because "[h]is wife and sister allegedly learned of the family relationship," between Mr. Manning and Mr. Valentine, "but there's nothing to suggest that they told the defendant until after his post-conviction proceedings had ended." Dkt. # 72, at 2-3. The Tenth Circuit also stated that it was "left without any meaningful evidence that [Mr. Xiong] had known about the family relationship prior to his conviction." Id. at 3. The Tenth Circuit therefore instructed this Court to reconsider the need for an evidentiary hearing. Id.

As this Court stated in its prior ruling, "[a] court's decision to grant an evidentiary hearing before adjudicating a claim asserted in a § 2254 petition is tightly circumscribed." Dkt. # 61, at 6.

But the court's decision to hold an evidentiary hearing in a habeas proceeding does not occur in a vacuum. The Court thus begins by discussing general limits on federal habeas review and specific limits on holding evidentiary hearings in federal habeas proceedings. Then, considering those limits, the Court explains why § 2254(e)(2) bars Mr. Xiong's request for an evidentiary hearing.

**1. General limits on federal habeas review**

A state prisoner may seek federal habeas relief on the ground that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). But "the availability of habeas relief is narrowly circumscribed." Shinn v. Ramirez, 596 U.S. 366, 375-76 (2022). "Among other restrictions, only rarely may a federal habeas court hear a claim or consider evidence that a prisoner did not previously present to the state courts in compliance with state procedural rules." Id.

> [B]oth Congress and federal habeas courts have set out strict rules requiring prisoners to raise all of their federal claims in state court before seeking federal relief. First, AEDPA requires state prisoners to "exhaus[t] the remedies available in the courts of the State" before seeking federal habeas relief. 28 U.S.C. § 2254(b)(1)(A). Ordinarily, a state prisoner satisfies this exhaustion requirement by raising his federal claim before the state courts in accordance with state procedures. See O'Sullivan v. Boerckel, 526 U.S. 838, 848, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999). If he does so, a federal habeas court may hear his claim, but its review is highly circumscribed. In particular, the federal court may review the claim based solely on the state-court record, see Cullen v. Pinholster, 563 U.S. 170, 180, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011), and the prisoner must demonstrate that, under this Court's precedents, no "fairminded juris[t]" could have reached the same judgment as the state court, Harrington [v. Richter], 562 U.S. [89,] 102, 131 S. Ct. 770; see § 2254(d).
>
> State prisoners, however, often fail to raise their federal claims in compliance with state procedures, or even raise those claims in state court at all. If a state court would dismiss these claims for their procedural failures, such claims are technically exhausted because, in the habeas context, "state-court remedies are . . . 'exhausted' when they are no longer available, regardless of the reason for their unavailability." Woodford v. Ngo, 548 U.S. 81, 92-93, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006). But to allow a state prisoner simply to ignore state procedure on the way to federal court would defeat the evident goal of the exhaustion rule. See Coleman, 501 U.S. at 732, 111 S. Ct. 2546. Thus, federal habeas courts must apply "an important 'corollary' to the exhaustion requirement": the doctrine of

> procedural default. Davila [v. Davis], 582 U.S. [521, 527], 137 S. Ct., at 2064. Under that doctrine, federal courts generally decline to hear any federal claim that was not presented to the state courts "consistent with [the State's] own procedural rules." Edwards v. Carpenter, 529 U.S. 446, 453, 120 S. Ct. 1587, 146 L. Ed. 2d 518 (2000).
>
> Together, exhaustion and procedural default promote federal-state comity. Exhaustion affords States "an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights," Duckworth v. Serrano, 454 U.S. 1, 3, 102 S. Ct. 18, 70 L.Ed.2d 1 (1981) (per curiam), and procedural default protects against "the significant harm to the States that results from the failure of federal courts to respect" state procedural rules, Coleman, 501 U.S. at 750, 111 S. Ct. 2546. Ultimately, "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without [giving] an opportunity to the state courts to correct a constitutional violation," Darr v. Burford, 339 U.S. 200, 204, 70 S. Ct. 587, 94 L. Ed. 761 (1950), and to do so consistent with their own procedures, see Edwards, 529 U.S. at 452-453, 120 S. Ct. 1587.

Ramirez, 596 U.S. at 377-79.

Nonetheless, "a federal court is not required to automatically deny unexhausted or procedurally defaulted claims." Id. at 379. In some circumstances, a state prisoner "might have an opportunity to return to state court to adjudicate that claim" and satisfy the exhaustion requirement. Id. If state remedies are no longer available to permit exhaustion, a federal court may deem the unexhausted claim procedurally defaulted and "can forgive the default and adjudicate the claim if the prisoner provides an adequate excuse." Id.

A federal court may excuse a procedural default only if the state prisoner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750, "To establish cause, the prisoner must 'show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" Ramirez, 596 U.S. at 379 (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)). "A factor is external to the defense if it 'cannot fairly be attributed to' the prisoner." Davila, 582 U.S. at 528 (quoting Coleman, 501 U.S. at 753).

> With respect to cause, "[a]ttorney ignorance or inadvertence" cannot excuse procedural default. Coleman, 501 U.S. at 753, 111 S. Ct. 2546. "[T]he attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must bear the risk of attorney error." Ibid. (internal quotation marks omitted). That said, "if the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State." [Carrier], 477 U.S. at 488, 106 S. Ct. 2639. That is not because a constitutional error "is so bad that the lawyer ceases to be an agent" of the prisoner, but rather because a violation of the right to counsel "must be seen as an external factor" to the prisoner's defense. Coleman, 501 U.S. at 754, 111 S. Ct. 2546 (internal quotation marks omitted). "It follows, then, that in proceedings for which the Constitution does not guarantee the assistance of counsel at all, attorney error cannot provide cause to excuse a default." Davila, 582 U.S., at [529], 137 S. Ct., at 2065.
>
> In Martinez, [the Supreme] Court recognized a "narrow exception" to the rule that attorney error cannot establish cause to excuse a procedural default unless it violates the Constitution. 566 U.S., at 9, 132 S. Ct. 1309. There, the Court held that ineffective assistance of state postconviction counsel may constitute "cause" to forgive procedural default of a trial-ineffective-assistance claim, but only if the State requires prisoners to raise such claims for the first time during state collateral proceedings. See ibid. One year later, in Trevino v. Thaler, 569 U.S. 413, 133 S. Ct. 1911, 185 L. Ed. 2d 1044 (2013), [the Supreme] Court held that this "narrow exception" applies if the State's judicial system effectively forecloses direct review of trial-ineffective-assistance claims. Id., at 428, 133 S. Ct. 1911. Otherwise, attorney error where there is no right to counsel remains insufficient to show cause. Martinez, 566 U.S. at 16, 132 S. Ct. 1309.

Ramirez, 596 U.S. at 380.

In Maples v. Thomas, 565 U.S. 266 (2012), the Supreme Court recognized another exception to the rule that attorney error cannot establish cause to excuse a procedural default unless it violates the Constitution. The question presented in Maples was "whether [the petitioner] ha[d] shown cause to excuse the missed notice of appeal deadline" in state court, resulting in a procedural default of his federal claim. 565 U.S. at 280. The Maples Court restated the general rule that "[n]egligence on the part of a prisoner's postconviction attorney does not qualify as 'cause'" to excuse a procedural default. Id.; see also id. ("[W]hen a petitioner's postconviction attorney misses a filing deadline, the petitioner is bound by the oversight and cannot rely on it to establish cause."). But the Supreme Court recognized an exception "when an attorney abandons his client

without notice, and thereby occasions the default." Id. at 281. In that situation, the Maples Court reasoned, "[h]aving severed the principal-agent relationship, an attorney no longer acts, or fails to act, as the client's representative," and attorney error is not attributable to the petitioner. Id.; see Cadet v. Fla. Dep't of Corr., 853 F.3d 1216, 1229 (11th Cir. 2017) (noting that "[u]nder fundamental principles of agency law, the agency relationship between an attorney and his client can be severed, with the result that the client is not constructively charged with his attorney's knowledge or actions when, for example, the attorney actually abandons his client or purposely acts adversely to his client's interests or commits another serious breach of loyalty to his client"). The Maples Court further explained that "under agency principles, a client cannot be charged with the acts or omissions of an attorney who has abandoned him. Nor can a client be faulted for failing to act on his own behalf when he lacks reason to believe his attorneys of record, in fact, are not representing him." 565 U.S. at 283. But a claim of "attorney error, however egregious," is different from "a claim that an attorney ha[s] essentially abandoned his client." Id. at 282-83; see Cadet, 853 F.3d at 1234 ("Negligence, however gross, is not the same as abandonment.").

Even if a petitioner can show cause for a procedural default the petitioner also must establish prejudice. This requires the petitioner to "show not merely a substantial federal claim, such that the errors at . . . trial created a *possibility* of prejudice, but rather that the constitutional violation worked to his *actual* and substantial disadvantage." Ramirez, 596 U.S. at 379 (emphases in original; cleaned up) (quoting Carrier, 477 U.S. at 494). Unless a prisoner establishes cause and prejudice, the prisoner may overcome a procedural default only by convincing the federal court "that federal review of his claims is necessary to prevent a fundamental miscarriage of justice." Coleman, 501 U.S. at 757. This requires the state prisoner to present a credible claim of actual innocence. See McQuiggin v. Perkins, 569 U.S. 383, 386, 393 (2013) (concluding that the

"miscarriage of justice exception . . . survived AEDPA's passage" and holding "that actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . or . . . expiration of the statute of limitations"); Carrier, 477 U.S. at 496 ("[W]e think that in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."). A state prisoner seeking to overcome a procedural bar through a claim of "actual innocence" must present "new reliable evidence" and "must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." Schlup v. Delo, 513 U.S. 298, 324, 327 (1995).

**2. Specific limits on evidentiary hearings**

"Although state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so," because federal habeas courts are not to be used as "'an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.'" Pinholster, 563 U.S. at 186 (quoting Williams, 529 U.S. at 437). Specifically, 28 U.S.C. § 2254(e)(2) provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> (A) the claim relies on—
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). But "§ 2254(e)(2) applies only when a prisoner 'has failed to develop the factual basis of a claim.'" Ramirez, 596 U.S. at 382. As used in § 2254(e)(2), the term "fail" "mean[s] that the prisoner must be 'at fault' for the undeveloped record in state court." Id. (citing Williams, 529 U.S. at 432); see also Williams, 529 U.S. at 430 (concluding that the phrase "failed to develop," as used in the opening clause of § 2254(e)(2), "implies some lack of diligence"). In describing the "inquiry mandated by the opening clause of § 2254(e)(2), the Williams Court explained that

> [t]he question is not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts. The purpose of the fault component of "failed" is to ensure the prisoner undertakes his own diligent search for evidence. Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend . . . upon whether those efforts could have been successful. Though lack of diligence will not bar an evidentiary hearing if efforts to discover the facts would have been in vain, see § 2254(e)(2)(A)(ii), and there is a convincing claim of innocence, see § 2254(e)(2)(B), only a prisoner who has neglected his rights in state court need satisfy these conditions. The statute's later reference to diligence pertains to cases in which the facts could not have been discovered, whether there was diligence or not.

Williams, 529 U.S. at 435. "Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." Id. at 432. The Williams Court further explained that

> [d]iligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law. . . . For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error. If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met. . . .Yet comity is not served by saying a prisoner "has failed to develop the factual basis of a claim" where he was unable to develop his claim in state court despite diligent effort. In that circumstance, an evidentiary hearing is not barred by § 2254(e)(2).

Williams, 529 U.S. at 436-37. Stated succinctly, § 2254(e)(2) "bars an evidentiary hearing for a nondiligent petitioner unless the petitioner can satisfy both §§ 2254(e)(2)(A) and (B)." Pinholster, 563 U.S. at 209-10; see Fairchild v. Workman, 579 F.3d 1134, 1145 (10th Cir. 2009) ("Under AEDPA, a federal habeas court may not grant an evidentiary hearing to a defendant who failed to develop his claim in state court, except in a few, narrowly defined circumstances.").

"[U]nder AEDPA and [Supreme Court] precedents, state postconviction counsel's ineffective assistance in developing the state-court record is attributed to the prisoner." Ramirez, 596 U.S. at 382; see Williams 529 U.S. at 432 ("Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner *or the prisoner's counsel*." (emphasis added)); Holland v. Jackson, 542 U.S. 649, 653 (2004) (finding it "difficult to see . . . how [the petitioner] could claim due diligence" for purposes of § 2254(e)(2)'s opening clause after a years-long delay in obtaining a witness statement; noting that the petitioner "complains that his state postconviction counsel did not heed his pleas for assistance"; and stating that "[a]ttorney negligence . . . is chargeable to the client and precludes relief unless the conditions of § 2254(e)(2) are satisfied").

The question presented in Ramirez was "whether the equitable rule announced in Martinez permits a federal court to dispense with § 2254(e)(2)'s narrow limits because a prisoner's state postconviction counsel negligently failed to develop the state-court record." Ramirez, 596 U.S. at 371. The Ramirez Court held "that it does not." Id. After discussing when attorney error can and cannot excuse a procedural default, the Ramirez Court stated that "[t]here is an even higher bar for excusing a prisoner's failure to develop the state-court record." 596 U.S. at 381. In explaining this distinction, the Ramirez Court explained:

> Shortly before AEDPA, we held that a prisoner who "negligently failed" to develop the state-court record must satisfy Coleman's cause-and-prejudice standard

> before a federal court can hold an evidentiary hearing. Keeney v. Tamayo-Reyes, 504 U.S. 1, 9, 112 S. Ct. 1715, 118 L.Ed.2d 318 (1992). In Keeney, we explained that "little [could] be said for holding a habeas petitioner to one standard for failing to bring a claim in state court and excusing the petitioner under another, lower standard for failing to develop the factual basis of that claim in the same forum." Id., at 10, 112 S. Ct. 1715. And, consistent with Coleman, we held that evidentiary development would be inappropriate "where the cause asserted is attorney error." 504 U.S. at 11, n. 5, 112 S. Ct. 1715.
>
> Four years later, Congress enacted AEDPA and replaced Keeney's cause-and-prejudice standard for evidentiary development with the even "more stringent requirements" now codified at 28 U.S.C. § 2254(e)(2). Williams v. Taylor, 529 U.S. 420, 433, 120 S. Ct. 1479, 146 L.Ed.2d 435 (2000) (Michael Williams). Section 2254(e)(2) provides that, if a prisoner "has failed to develop the factual basis of a claim in State court proceedings," a federal court may hold "an evidentiary hearing on the claim" in only two limited scenarios. Either the claim must rely on (1) a "new" and "previously unavailable" "rule of constitutional law" made retroactively applicable by this Court, or (2) "a factual predicate that could not have been previously discovered through the exercise of due diligence." §§ 2254(e)(2)(A)(i), (ii). If a prisoner can satisfy either of these exceptions, he also must show that further factfinding would demonstrate, "by clear and convincing evidence," that "no reasonable factfinder" would have convicted him of the crime charged. § 2254(e)(2)(B). Finally, even if all of these requirements are satisfied, a federal habeas court still is not *required* to hold a hearing or take any evidence. Like the decision to grant habeas relief itself, the decision to permit new evidence must be informed by principles of comity and finality that govern every federal habeas case. Cf. Brown [v. Davenport], 596 U.S. [118], at [122-33], 142 S. Ct., at 1523–1524.
>
> Even though AEDPA largely displaced Keeney, § 2254(e)(2) retained "one aspect of Keeney's holding." Michael Williams, 529 U.S. at 433, 120 S. Ct. 1479. Namely, § 2254(e)(2) applies only when a prisoner "has failed to develop the factual basis of a claim." We interpret "fail," consistent with Keeney, to mean that the prisoner must be "at fault" for the undeveloped record in state court. 529 U.S. at 432, 120 S. Ct. 1479. A prisoner is "at fault" if he "bears responsibility for the failure" to develop the record. Ibid.

Ramirez, 596 U.S. at 381-82 (emphasis in original).[28]

---

[28] Though not at issue in Ramirez, just as § 2254(e)(2)'s diligence standard in the opening clause replaced Keeney's use of Coleman's cause-and-prejudice standard in the context of evidentiary hearings, § 2254(e)(2)(B)'s "clear and convincing" standard replaced Schlup's more-likely-than-not standard in that same context. See Perkins, 569 U.S. at 395 ("Congress did not simply incorporate the miscarriage of justice exception into §§ 2244(b)(2)(B) and 2254(e)(2). Rather, Congress constrained the application of the exception.").

Applying these principles, the Ramirez Court declined to extend Martinez's rule to permit "ineffective assistance of postconviction counsel [to] excuse a prisoner's failure to develop the state-court record under § 2254(e)(2)." Ramirez, 596 U.S. at 384. Citing its lack of "authority to amend" § 2254(e)(2), the Ramirez Court held "that, under § 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel." Id. at 382. Thus, "under § 2254(e)(2), a prisoner is 'at fault' even when state postconviction counsel is negligent." 596 U.S. at 384. "In such a case, a federal court may order an evidentiary hearing or otherwise expand the state-court record only if the prisoner can satisfy § 2254(e)(2)'s stringent requirements." Id.

The Ramirez Court also rejected a "second reading of § 2254(e)(2)" proposed by the habeas petitioners in that case (identified there as "respondents"):

> [Respondents'] interpretation proceeds in two steps. First, respondents argue that because § 2254(e)(2) bars only "an evidentiary hearing on the claim," a federal court may hold an evidentiary hearing to determine whether there is cause and prejudice. In respondents' view, a so-called "Martinez hearing" is not a "hearing *on the claim*." § 2254(e)(2) (emphasis added). Second, with that evidence admitted for cause and prejudice, respondents contend that the habeas court may then consider the new evidence to evaluate the merits of the underlying ineffective-assistance claim. By considering already admitted evidence, respondents reason, the habeas court is not holding a "hearing" that § 2254(e)(2) otherwise would prohibit. Ibid.
>
> There are good reasons to doubt respondents' first point, but we need not address it because our precedent squarely forecloses the second. In Holland, we explained that § 2254(e)(2)'s "restrictions apply a fortiori when a prisoner seeks relief based on new evidence without an evidentiary hearing." 542 U.S. at 653, 124 S. Ct. 2736 (emphasis deleted). The basis for our decision was obvious: A contrary reading would have countenanced an end-run around the statute. Federal habeas courts could have accepted any new evidence so long as they avoided labeling their intake of the evidence as a "hearing." Therefore, when a federal habeas court convenes an evidentiary hearing for any purpose, or otherwise admits or reviews new evidence for any purpose, it may not consider that evidence on the merits of a negligent prisoner's defaulted claim unless the exceptions in § 2254(e)(2) are satisfied.

> Respondents all but concede that their argument amounts to the same kind of evasion of § 2254(e)(2) that we rejected in Holland. They nonetheless object that Holland renders many Martinez hearings a nullity, because there is no point in developing a record for cause and prejudice if a federal court cannot later consider that evidence on the merits. While we agree that any such Martinez hearing would serve no purpose, that is a reason to dispense with Martinez hearings altogether, not to set § 2254(e)(2) aside. Thus, if that provision applies and the prisoner cannot satisfy its "stringent requirements," Michael Williams, 529 U.S. at 433, 120 S. Ct. 1479, a federal court may not hold an evidentiary hearing—or otherwise consider new evidence—to assess cause and prejudice under Martinez.
>
> This follows from our decision in Schriro v. Landrigan, 550 U.S. 465, 127 S. Ct. 1933, 167 L.Ed.2d 836 (2007). There, we held that a federal court, "[i]n deciding whether to grant an evidentiary hearing, . . . must consider whether such a hearing could enable an applicant to prove . . . factual allegations [that] would entitle [him] to federal habeas relief." Id., at 474, 127 S. Ct. 1933. "This approach makes eminent sense," for if "district courts held evidentiary hearings without first asking whether the evidence the petitioner seeks to present would satisfy AEDPA's demanding standards, they would needlessly prolong federal habeas proceedings." [Pinholster], 563 U.S. at 208-209, 131 S. Ct. 1388 (SOTOMAYOR, J., dissenting). Here, holding a Martinez hearing when the prisoner cannot "satisfy AEDPA's demanding standards" in § 2254(e)(2) would "prolong federal habeas proceedings" with no purpose. 563 U.S. at 209, 131 S. Ct. 1388 (SOTOMAYOR, J., dissenting). And because a federal habeas court may never "needlessly prolong" a habeas case, ibid., particularly given the "essential" need to promote the finality of state convictions, Calderon, 523 U.S. at 555, 118 S. Ct. 1489, a Martinez hearing is improper if the newly developed evidence never would "entitle [the prisoner] to federal habeas relief," Schriro, 550 U.S. at 474, 127 S. Ct. 1933.

Ramirez, 596 U.S. at 388-90.

One month after issuing its decision in Ramirez, the Supreme Court reinforced the limits on evidentiary hearings in Shoop v. Twyford, 596 U.S. 811 (2022). In Twyford, a federal district court employed the All Writs Act, 28 U.S.C. § 1651, to "order the [s]tate to transport a prisoner in its custody to a hospital for medical testing" based on the prisoner's argument "that the testing could reveal evidence helpful in his effort to obtain habeas corpus relief." 596 U.S. at 814. The question presented was whether that order was "'necessary or appropriate in aid of' the federal court's resolution of the prisoner's habeas case." Id. The answer was no. Id. Reiterating § 2254(e)(2)'s "quite limited situations" that permit a federal court to "admit new evidence" in a

federal habeas proceeding when a petitioner failed to develop the factual basis of a claim in state court, the Twyford Court explained that when a prisoner requests an evidentiary hearing or otherwise seeks to introduce new evidence, a federal court "must, consistent with the AEDPA, determine at the outset whether the new evidence sought could be lawfully considered." 596 U.S. at 819-21.

Nonetheless, neither Ramirez nor Twyford disturbed Williams's holding that § 2254(e)(2) does not apply, and thus does not bar an evidentiary hearing, when a petitioner made diligent, even if unsuccessful, efforts to develop his federal claim in state court. Williams, 529 U.S. at 435. In that situation, "a federal habeas court should proceed to analyze whether an evidentiary hearing is appropriate or required under pre-AEDPA standards." Simpson v. Carpenter, 912 F.3d 542, 576 (10th Cir. 2018) (quoting Barkell v. Crouse, 468 F.3d 684, 693 (10th Cir. 2006)). "Under this pre-AEDPA standard, a petitioner is entitled to an evidentiary hearing 'if (1) the facts were not adequately developed in state court, so long as that failure was not attributable to the petitioner, and (2) his allegations, if true and not contravened by the existing factual record, would entitle him to habeas relief.'" Id. (quoting Barkell, 468 F.3d at 696).[29]

That said, after Ramirez, it may be an open question whether § 2254(e)(2) only applies to a request for an evidentiary hearing on the merits of a substantive habeas claim or whether it also applies to a request for an evidentiary hearing on the issue of cause and prejudice. See Ramirez, 596 U.S. at 388 (finding "good reasons to doubt" the argument "that because § 2254(e)(2) bars

[29] Simpson's suggestion that a petitioner is "entitled to an evidentiary hearing" if he satisfies pre-AEDPA standards is questionable after Ramirez. The Ramirez Court clarified that "even if all of [§ 2254(e)(2)'s] requirements are satisfied, a federal habeas court still is not *required* to hold a hearing or take any evidence." 596 U.S. at 381. The Ramirez Court explained: "Like the decision to grant habeas relief itself, the decision to permit new evidence must be informed by principles of comity and finality that govern every federal habeas case." Id. at 381-82.

only 'an evidentiary hearing on the claim,' a federal court may hold an evidentiary hearing to determine whether there is cause and prejudice"). Some circuit courts have held that § 2254(e)(2) does not limit a court's discretion to hold an evidentiary hearing on the issue of cause and prejudice. See, e.g., Ledford v. Warden, 975 F.3d 1145, 1163 (11th Cir. 2020) (citing pre-Ramirez circuit precedent as providing that neither § 2254(e)(2) nor the pre-AEDPA standard of cause and prejudice apply when a petitioner requests an evidentiary hearing on the procedural default of a substantive claim); Wooten v. Norris, 578 F.3d 767, 780 (8th Cir. 2009) (noting that "the strict rules regarding the availability of federal evidentiary hearings on the merits of habeas cases do not preclude our court from ordering evidentiary hearings on the limited issues of cause or prejudice"); cf. Fontenot v. Crow, 4 F.4th 982, 1044 & n.31 (10th Cir. 2021) (citing Schiro for the proposition that when § 2254(e)(2) does not bar an evidentiary hearing a federal court has discretion to grant one and suggesting "an evidentiary hearing may be an advisable method for testing actual innocence assertions"). Regardless of whether Ramirez permits, precludes, or strongly discourages a hearing on cause and prejudice, the Ramirez Court made clear that evidentiary hearings on that issue have limited utility if § 2254(e)(2) applies and the petitioner does not satisfy its stringent requirements. 596 U.S. at 389; see Twyford, 596 U.S. 823 ("[I]f § 2254(e)(2) applies and the prisoner cannot meet the statute's standards for admitting new merits evidence, it serves no purpose to develop such evidence just to assess cause and prejudice."); Williams v. Superintendent Mahanoy SCI, 45 F.4th 713, 723 (3d Cir. 2022) (noting that even if Third Circuit "precedent . . . would allow a Martinez hearing, the [d]istrict [c]ourt may not use the expanded record to decide the merits of [the petitioner's] ineffective-assistance claim, so a Martinez hearing would be a waste of time unless [the petitioner] can prevail on the state record").

### 3. Analysis

Because Mr. Xiong's arguments in the Rule 60(b) motion and the Tenth Circuit's decision both reference this Court's prior determination that Mr. Xiong did not show cause to overcome the procedural default of his conflict-of-interest claim, the Court asked Mr. Xiong to clarify his purpose for requesting an evidentiary hearing. Dkt. # 75, at 10 n.10, 16; see also Dkt. # 72, at 2-3; Dkt. # 56, at 23-28. Mr. Xiong responded that he requests an evidentiary hearing on the merits of the conflict-of-interest claim and on the issue of whether he can establish cause and prejudice to overcome the procedural default of that claim. Dkt. # 76, at 1-2.[30]

Mr. Xiong appears to contend: (1) that § 2254(e)(2) does not apply because he is not at fault for failing to develop the conflict-of-interest claim in state court; (2) that he has satisfied pre-AEDPA standards for obtaining an evidentiary hearing by showing he is not at fault and advancing allegations that entitle him to relief; and (3) that, if § 2254(e)(2) applies, he has satisfied its requirements. Dkt. ## 81, 82.[31]

Respondent contends that this Court should: (1) reaffirm its ruling that § 2254(e)(2) bars an evidentiary hearing on the merits of the conflict-of-interest claim because Mr. Xiong failed to

[30] Mr. Xiong also provided a proposed list of witnesses and a "synopsis" of the facts he would like to develop at an evidentiary hearing. Dkt. # 76, at 2-4. He would like to call at least five witnesses to develop evidence about: (1) Mr. Manning's "family ties" with Mr. Valentine; (2) the details of Mr. Manning's pretrial disclosure to Ms. Moua and Ms. Xiong; (3) his own lack of knowledge about the pretrial disclosure "before or during trial"; and (4) Mr. Manning's motives for inadequately cross-examining Mr. McCleary and failing to "zealously investigate and defend" Mr. Xiong at trial. Id.

[31] Mr. Xiong includes several arguments in his post-remand brief and post-remand reply that appear to be more relevant to proving the merits of his conflict-of-interest claim or establishing cause and prejudice to overcome the procedural default of that claim. Dkt. ## 81, 82. Both of those issues are beyond the scope of the limited remand for reconsideration of the need for an evidentiary hearing. However, to the extent Mr. Xiong's arguments are relevant to this Court's reconsideration of the need for an evidentiary hearing, this Court has considered them.

develop the factual basis of that claim in state court; (2) find that if § 2254(e)(2) does not apply, Mr. Xiong has not satisfied pre-AEDPA standards for obtaining an evidentiary hearing; and (3) find that Mr. Xiong has not established any reason for this Court to hold an evidentiary hearing on the issue of cause and prejudice. Dkt. # 77.

**a. Hearing on the merits**

Section 2254(e)(2) applies and bars Mr. Xiong's request for an evidentiary hearing on the merits of the conflict-of-interest claim.

**i. Section 2254(e)(2) applies**

As previously discussed, "§ 2254(e)(2) applies only when a prisoner 'has failed to develop the factual basis of a claim.'" Ramirez, 596 U.S. at 382. The phrase "failed to develop," as used in the opening clause of § 2254(e)(2), "implies some lack of diligence." Williams, 529 U.S. at 430. For purposes of § 2254(e)(2)'s opening clause, the threshold diligence inquiry asks, "not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts." Id. at 435. The prisoner need not be successful in his efforts to investigate and pursue claims in state court, but the prisoner must "ma[k]e a reasonable attempt, in light of the information available at the time, to investigate and pursue" them. Id. Section 2254(e)(2) applies to Mr. Xiong's request for an evidentiary hearing on the merits of the conflict-of-interest claim because Mr. Xiong admits that he made no attempt "to raise the conflict-of-interest claim in any state court proceedings." Dkt. # 76, at 7. He resists this conclusion for several reasons, but none is persuasive.

First, he appears to argue that he is not "at fault" because no one told him about Mr. Manning's conflict "until after his direct and postconviction had ended." Dkt. # 81, at 4. The undisputed facts in the record confirm that Mr. Xiong first learned of Mr. Manning's relationship to Mr. Valentine in May 2020, two months after the OCCA denied his postconviction appeal. But,

as respondent contends, Mr. Xiong's belated discovery of the conflict—i.e., his discovery after the conclusion of his direct and postconviction appeals—does not preclude a finding that he is "at fault" for failing to develop the conflict-of-interest claim in state court. Dkt. # 77, at 16. Because diligence is measured "in light of the information available at the time," Williams, 529 U.S. at 435, the Court considers whether Mr. Xiong diligently pursued his claim in state court after he first learned of Mr. Manning's alleged conflict in May 2020. Nothing in the record suggests that he did. Critically, as respondent contends, Mr. Xiong could have pursued his conflict-of-interest claim through a second application for postconviction relief. Dkt. # 77, at 15-19. Oklahoma law provides:

> All grounds for relief available to an applicant under this act must be raised in his original, supplemental or amended application. Any ground finally adjudicated or not so raised, *or knowingly, voluntarily and intelligently waived* in the proceeding that resulted in the conviction or sentence or in any other proceeding the applicant has taken to secure relief may not be the basis for a subsequent application, *unless the court finds a ground for relief which for sufficient reason was not asserted or was inadequately raised in the prior application*.

OKLA. STAT. tit. 22, § 1086 (2011) (emphases added), amended by Okla. Sess. Law Serv. Ch. 144, § 3 (eff. Nov. 1, 2022).[32] As respondent contends, because Mr. Xiong did not know about the conflict-of-interest claim until 2020, he could not "knowingly, voluntarily, and intelligently waive" it by failing to raise it on direct appeal or in his first application for postconviction relief.

[32] On November 1, 2022, Oklahoma adopted a one-year statute of limitations for original and subsequent postconviction applications, like the one-year statute of limitations prescribed in 28 U.S.C. § 2244(d)(1). Dkt. # 77, at 16; see OKLA. STAT. tit. 22, § 1080.1. However, because Mr. Xiong's conviction was final before November 1, 2022, he had until November 1, 2023, to file a second application for postconviction relief presenting a claim based on newly discovered evidence. See Okla. Stat. tit. 22, 1080.1(A)(5) (providing one year limitations period beginning on the "date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence"); Hammon v. State, 540 P.3d 486, 489 (Okla. Crim. App. 2023) (adopting one-year grace period for defendants with convictions that were final before enactment of § 1080.1).

Dkt. # 77, at 15-16. Further, under Oklahoma law, his belated discovery of the factual predicate of that claim may have provided "sufficient reason" for not raising it his prior proceedings. See Smith v. State, 546 P.2d 1351, 1354 (Okla. Crim. App. 1976) (stating that "all issues known to a Petitioner must be raised in the first application for postconviction relief in the trial court, or they will be deemed to have been waived *unless there be good and sufficient reason for their not having been raised*, *such as newly discovered evidence not known at the time of the filing of the original postconviction application*" (emphasis added); see also Smith v. State, 826 P.2d 615, 617-18 (Okla. Crim. App. 1992) (reviewing postconviction claim based on "newly discovered evidence" that came to light "after the direct appeal," noting evidentiary hearing had been held on new claim, and adjudicating claim on the merits). Williams instructs that establishing diligence for purposes of § 2254(e)(2)'s opening clause "will require in the usual case that the prisoner, at a minimum seek an evidentiary hearing in state court in the manner prescribed by state law." 529 U.S. at 437. Here, Mr. Xiong did not attempt to present his claim in state court in the manner permitted by state

law, much less seek an evidentiary hearing in state court to develop the factual basis of that claim.[33]

Under these circumstances, Mr. Xiong was not diligent and § 2254(e)(2) applies.

---

[33] Oklahoma's adoption of a one-year statute of limitations likely bars Mr. Xiong from now pursuing the conflict-of-interest claim through a second or subsequent application for postconviction relief. See, supra, n. 32. While that result may seem harsh, that is the nature of procedural rules, like statutes of limitation. But, like respondent, the Court acknowledges that the evidence in the expanded record showing that Mr. Xiong did not know about Mr. Manning's relationship to Mr. Valentine until May 2020 and respondent's new argument that Mr. Xiong could have presented that claim in a second application for postconviction relief in 2020 calls into question this Court's application of an anticipatory procedural bar to deem the conflict-of-interest claim procedurally defaulted in 2022. Dkt. # 77, at 17-18; see Dkt. # 37, at 20-22. Specifically, Mr. Xiong asserts that the "courts never instructed him that he could file a second post-conviction." Dkt. # 82, at 3. But "the courts" had no duty to do so. Mr. Xiong filed the amended petition through counsel and represented that he would exhaust his claim in state court, and even when a habeas petitioner appears pro se, a court may not act as his advocate. Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991); cf. Nicholls v. Long, No. 20-1159, 2022 WL 211617, at *9 (10th Cir. Jan. 25, 2022) (unpublished) ("We will not craft arguments to support the cause of even pro se litigants . . . a fortiori we will not attempt to do so for [the petitioner] in this counseled appeal."). This Court applied an anticipatory procedural bar after considering Mr. Xiong's counseled amended petition and respondent's arguments in the response in opposition to the petition, and Mr. Xiong filed no reply to counter those arguments. Thus, in 2022, when the Court deemed the claim procedurally defaulted it considered: (1) Mr. Xiong's statement that the conflict-of-interest claim was "newly discovered evidence brought to counsel's attention," his concession that he had not exhausted the claim in state court, and his allegations that Mr. Xiong's wife (for reasons still unknown) inquired before trial whether Mr. Manning was related to Mr. Valentine, that Mr. Xiong's wife and sister knew about the conflict before trial and "were actively trying to aid" him while he awaited trial, that Mr. Xiong "was not present at th[e] meeting" when Mr. Manning disclosed the relationship, that his "family did not "disclose what had been discussed," and that neither trial attorney "had Mr. Xiong give written informed consent of the personal conflict that was present with Mr. Manning," Dkt. # 24, at 15-17; (2) the 2020 affidavits from Ms. Moua and Ms. Xiong, neither of which included statements identifying when or if they discussed Mr. Manning's alleged conflict with Mr. Xiong or why Ms. Moua first inquired about a familial relationship, Dkt. ## 30-6, 30-7; and (3) respondents unopposed arguments that the OCCA likely would treat the conflict-of-interest claim as waived if Mr. Xiong raised it in a second application for postconviction relief, Dkt. # 35, at 48-53. As respondent notes, the allegations in the counseled amended petition "did not allege that [Mr. Xiong] did not know about the familial relationship prior to trial, and the facts alleged in the [a]mended [p]etition left room for that to be the case." Dkt. # 77 at 17-18 n. 1. Given that Mr. Xiong now submits evidence showing that he learned of Mr. Manning's relationship to Mr. Valentine in May 2020 from Ms. Moua, months before he filed the amended petition in August 2020, the absence of allegations on that point in either the amended petition or Ms. Moua's August 2020 affidavit is inexplicable.

Next, Mr. Xiong appears to argue that he is not "at fault" for failing to develop the factual basis of the conflict-of-interest claim in state court because "he hired lawyers immediately" after he learned of Mr. Manning's alleged conflict. Dkt. # 82, at 3. According to Mr. Xiong, Mr. Armendariz "told [him] that the state appeals was over, thus an extension of time was filed and the newly discovered evidence was filed in federal court in August." Id. Mr. Xiong's account in his post-remand reply leaves out some important details that are found in his answers to interrogatories, his 2026 affidavit, and the record of this federal habeas proceeding. As previously discussed, the existing and expanded record show that Mr. Xiong (or his family) hired Mr. Armendariz in May 2020, Mr. Xiong told him about the conflict-of-interest claim, and Mr. Xiong relied on his advice that the claim would be filed in federal court as "newly discovered evidence" because "they could not return to state court." Dkt. # 81, at 20-21, 27-28. Mr. Xiong states he then "left it in [his attorneys] hands as they told him they would do all the work." Dkt. # 76, at 6-7. As a reminder, Mr. Armendariz has never appeared as counsel of record for Mr. Xiong in this case. Instead, Mr. Johnson entered his appearance in this case on May 20, 2020, very near the time Mr. Xiong states he first discovered the factual predicate of his conflict-of-interest claim and told Mr. Armendariz about it. Dkt. # 19. Mr. Johnson twice requested additional time to file an amended petition, representing both times that he was communicating by phone and corresponding by regular mail with Mr. Xiong, and that Mr. Xiong was actively involved in the process of identifying claims to be included in the amended petition. Dkt. ## 20, 22. Per Mr. Johnson, as of July 21, 2020, Mr. Xiong was "mailing his final two grounds that he feels need to be addressed within his petition" to Mr. Johnson. Dkt. # 22, at 2. Mr. Xiong confirms that rather than leaving all the work to his attorneys, he helped them prepare the amended petition. Specifically, Mr. Xiong sent Mr. Armendariz "his own pro se hand written (not typed) petition of over 100 pages consisting

of 12 proposition[s]" in July 2020. Dkt. # 39, at 3. He spoke with "habeas counsel" by phone two or three times before the amended petition was filed, Mr. Armendariz informed him by phone in August 2020 that only six claims would be raised in the amended petition, and Mr. Xiong "agreed" with that approach. Id.; Dkt. # 76, at 7; Dkt. # 81, at 27-28. Mr. Xiong also asked one or both of his habeas attorneys if he could see the amended petition before it was filed. Id. Then, on August 21, 2020, Mr. Johnson filed the amended petition raising only six claims. Dkt. # 24. Mr. Johnson stated in the amended petition that the sixth claim, i.e., the conflict-of-interest claim, was based on "newly discovered evidence brought to counsel's attention" and that he would "exhaust ground six in state court." Id. at 16-17. These somewhat inconsistent but undisputed facts show that Mr. Xiong exercised diligence in presenting his conflict-of-interest claim in *federal* court, not in *state* court. No facts in the record, however, show that Mr. Xiong or any attorney representing him made reasonable efforts to present the conflict-of-interest claim, or develop the facts to support it, in state court. As previously discussed, Mr. Xiong admits that he "personally" did not present the conflict-of-interest claim in any state court proceeding. Dkt. # 76, at 7. Mr. Armendariz apparently told Mr. Xiong he could not return to state court, whereas Mr. Johnson affirmatively represented in the counseled amended petition Mr. Xiong would exhaust the conflict-of-interest claim. But neither Mr. Xiong nor his habeas attorneys did so. Nor did either Mr. Johnson or Mr. Xiong ask this Court to grant a second stay of this habeas proceeding to permit exhaustion of the conflict-of-interest claim.[34] Under these circumstances, and regardless of whether Mr. Xiong's habeas

---

[34] Even though it would have been entirely reasonable for Mr. Xiong to rely on Mr. Johnson to exhaust the conflict-of-interest claim through a second postconviction application, the Court will not ignore clear evidence in the record of this case demonstrating that Mr. Xiong not only understood the exhaustion requirement when he filed his original pro se petition but also understood that he could (and did) obtain a stay to exhaust available state remedies after filing a habeas petition. Dkt. ## 1, 3, 16.

attorneys were merely inept or grossly negligent in failing to pursue the conflict-of-interest claim in state court, Mr. Xiong is "at fault" for failing to develop the factual basis of that claim in state court. See Ramirez, 596 U.S. at 382 ("[U]nder AEDPA and [Supreme Court] precedents, state postconviction counsel's ineffective assistance in developing the state-court record is attributed to the prisoner."); Holland, 542 U.S. at 653 (stating that "[a]ttorney negligence . . . is chargeable to the client and precludes relief unless the conditions of § 2254(e)(2) are satisfied"); Williams 529 U.S. at 432 ("Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, *attributable to the prisoner or the prisoner's counsel*." (emphasis added)).[35]

Lastly, Mr. Xiong appears to contend that his habeas attorneys' failure to develop the factual basis of his conflict-of-interest claim is not attributable to him because Mr. Armendariz and Mr. Johnson completely abandoned him. Dkt. # 81, at 20-21; Dkt. # 82, at 3-5.[36] He appears to rely on the following allegations to show abandonment: (1) Mr. Armendariz advised him "that they couldn't go back to state court and that they will file it as newly discovered evidence in federal court"; (2) Mr. Xiong "requested to see the [amended] petition before it was filed but didn't receive a copy until two months later"; (3) Mr. Xiong "was less informed about his case by counsel"; (4)

[35] Mr. Xiong mentions the Martinez exception and appears to do so to support that he can establish cause and prejudice for the procedural default of his conflict-of-interest claim. Dkt. # 81, at 21-22. To the extent his argument could be understood as relying on Martinez to show that he is not "at fault" under § 2254(e)(2), Ramirez forecloses that argument. 596 U.S. at 371, 382-84.

[36] It is not entirely clear whether Mr. Xiong alleges attorney abandonment to show cause to overcome the procedural default of the conflict-of-interest claim, to support his request for an evidentiary hearing and show he is not "at fault" for failing to develop that claim in state court, or to show extraordinary circumstances to support his request for relief under Rule 60(b). See Dkt. # 81, at 20-22 Regardless of his purpose for advancing these allegations, the Court finds he has not shown attorney abandonment as contemplated in Maples.

his attorneys were "difficult to contact," did not reply to letters, and took "weeks or months" to respond to his family's inquiries; (5) his attorneys did not inform him when the amended petition was denied so he did not discover the July 2022 order and judgment until seven months later when he saw his case in the law library (6) "habeas counsel was ineffective when they only filed a 16 page petition, citing no laws and constructing no arguments"; (7) his attorneys "[f]ailed to file a reply brief and denied [him] a chance to file one pro se when they didn't send him a copy of the response until 2 months later"; and (8) his attorneys failed to file a timely notice of appeal after this Court entered judgment against him in July 2022. Id. He further alleges that: (1) Mr. Armendariz "gave ill-legal advice and schemed [Mr. Xiong's] family to take out a . . . loan with no intent to safe guard his rights"; and (2) his attorneys failed to keep promises, failed to communicate, filed frivolous petitions, and missed deadlines. Dkt. # 82, at 3-5. Finally, as previously noted, in his motion for appointment of counsel, Mr. Xiong alleges he "last spoke to counsel in 2023 after counsel missed his habeas appeal deadline" and that "during that visit [Mr.] Johnson advise[d] him to forget about his federal appeal, and to sit in prison for a few years, and that when laws change, counsel would revisit his case for free." Dkt. # 89, at 2. Mr. Xiong states that he and Mr. Johnson "got into a[n] argument and haven't been in contact since." Id. As discussed, if an attorney abandons a habeas petitioner, so that the attorney no longer acts or fails to act as the petitioner's agent, attorney error that results in procedural default is "external" to the petitioner and can serve as cause to excuse the procedural default of a federal claim. Maples, 565 U.S. at 280. But Maples did not address attorney abandonment in the context of a prisoner's failure to develop the factual basis of a claim in state court under § 2254(e)(2). Id. Considering the distinction that Ramirez made between judicially crafted exceptions to judicially created rules and unauthorized judicial amendment of statutes, see 596 U.S. at 382, Maples's import in this case is

unclear. Regardless, even assuming Maples (unlike Martinez) applies when assessing diligence under § 2254(e)(2), Mr. Xiong has not demonstrated that he was abandoned. At most, Mr. Xiong's allegations show that his habeas attorneys may have committed egregious errors or may have been grossly negligent, by failing to know how to proceed in state and federal court with his conflict-of-interest claim, failing to timely communicate with him, and missing federal court deadlines. As previously stated, though, a claim of "attorney error, however egregious," is different from "a claim that an attorney ha[s] essentially abandoned his client." Maples, 565 U.S. at 282-83; see Cadet, 853 F.3d at 1234 ("Negligence, however gross, is not the same as abandonment."). Further, the Maples Court reasoned that a petitioner cannot be "faulted for failing to act on his own behalf when he lacks reason to believe his attorneys of record, in fact, are not representing him." 565 U.S. at 283. This suggests that the converse also is true: a petitioner could be "faulted for failing to act on his own behalf when he [has] reason to believe his attorneys of record, in fact, are not representing him." Id. Mr. Xiong's own allegations suggest he had reason to believe, before this Court entered judgment in July 2022, that Mr. Armendariz and Mr. Johnson were, in fact, not representing him. Mr. Xiong states that he hired Mr. Armendariz in May 2020, visited with him "only" one time, and spoke with him on the phone about three times before the amended petition was filed. Dkt. # 76, at 7; Dkt. # 81, at 27-28. Mr. Armendariz did not honor Mr. Xiong's request to see the amended petition before Mr. Johnson filed it in August 2020, and neither attorney sent him a copy of the amended petition until November 6, 2020. Id. When he received the copy of the amended petition Mr. Xiong was "disappointed" not only by the substance of the arguments, but by the fact that Mr. Johnson (not Mr. Armendariz) had filed it. Id.; Dkt. # 39, at 4. As of November 2020, Mr. Xiong might have suspected, at the very least, that Mr. Armendariz was, in fact, not representing him. By April 2021, when Mr. Xiong allegedly received a copy of the

response in opposition to his amended petition that was filed in November 2020, he might have suspected that his attorneys were less than diligent. Dkt. # 39, at 4. At that point though, Mr. Xiong apparently had not been completely abandoned because he allegedly urged them, before and after he received a copy of the response, that they should file a reply. Id. And, according to Mr. Xiong, he and Mr. Johnson did not finally cease all communication until 2023, after Mr. Xiong learned that Mr. Johnson had missed the deadline to appeal the July 2022 judgment. Dkt. # 89, at 2. On this record, the Court finds Mr. Xiong has not shown that his habeas attorneys completely abandoned him.

In sum, because Mr. Xiong could have developed the factual basis of his conflict-of-interest claim in state court by filing a second application for postconviction relief and requesting an evidentiary hearing in state court at any time between May 2020, when he first discovered the factual predicate of his claim, and November 2023, when his one-year grace period to file a second application for postconviction relief expired, and he did not make any attempt to do so, he is "at fault" for failing to develop that claim in state court within the meaning of the opening clause of § 2254(e)(2). This is so even if Mr. Xiong has shown that his habeas attorneys were grossly negligent in failing to develop the state court record as to that claim because he has not shown that his attorneys abandoned him and, under AEDPA and Supreme Court precedent, he bears the risk of attorney error in failing to develop the factual basis of a claim in state court.

**ii. Mr. Xiong has not satisfied § 2254(e)(2)(B)**

When § 2254(e)(2) applies, a court cannot hold an evidentiary hearing on a habeas claim unless the statute's stringent requirements are met. Williams, 529 U.S. at 437. Mr. Xiong has not shown that he can meet those requirements. Mr. Xiong persuasively argues that nothing in the state court record would have alerted him to Mr. Manning's conflict. Dkt. # 81, at 4-7. Further

even assuming without deciding that he could not have discovered Mr. Manning's relationship to Mr. Valentine, through due diligence, by speaking to his wife or sister (as he did in May 2020 when he discovered that relationship by talking to his wife), this means only that he has satisfied § 2254(e)(2)(A)(ii).

But he also must satisfy § 2254(e)(2)(B) by showing that "the facts underlying [his] claim would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [him] guilty of the underlying offense," as required by 28 U.S.C. § 2254(e)(2)(B); see McQuiggin, 569 U.S. at 398 ("Under AEDPA, a petitioner seeking an evidentiary hearing must show diligence and, in addition, establish her actual innocence by clear and convincing evidence."); Pinholster, 563 U.S. at 209-10 (noting that § 2254(e)(2) "bars an evidentiary hearing for a nondiligent petitioner unless the petitioner can satisfy both §§ 2254(e)(2)(A) and (B)"). He has not made that showing.

The facts underlying his claim are: (1) Mr. Manning, his trial attorney, was related to Mr. Valentine, the deceased victim; (2) Mr. Manning began representing Mr. Xiong in September 2014 for the murder of Mr. Valentine; (3) Mr. Manning did not learn until he attended a family gathering sometime before February 2016 that he and Mr. Valentine were related; (4) Mr. Manning and Mr. Echols, both of whom had ethical obligations to Mr. Xiong and to the state trial court, did not disclose to Mr. Xiong or the trial court that Mr. Manning was related to Mr. Valentine; (5) Mr. Manning said during opening statement the jury would hear Ms. Moua testify but he and Mr. Echols did not call her as a defense witness; (6) Mr. Manning elicited allegedly damaging testimony from Mr. McCleary about the distance between Mr. Xiong and Mr. Valentine at the time of the shooting; and (7) Mr. Manning did not adequately impeach Mr. McCleary with prior inconsistent statements. Dkt. # 24, at 15-16; Dkt. # 82.

This Court has thoroughly reviewed the state court record, including trial transcripts and the 2019 affidavits from individuals present on the night of the shooting whom Mr. Xiong claims should have been called as defense witnesses to support his claim of self-defense. See Dkt. ## 30-1 through 30-4 (trial transcripts); Dkt. ## 17-5 through 17-8 (2019 affidavits); see also supra, section I (discussing evidence and arguments presented at trial); Dkt. # 37, at 2-6 (same), 9-14 (evaluating Mr. Xiong's challenge to the sufficiency of the evidence). Based on that review, the Court finds that the facts underlying Mr. Xiong's procedurally defaulted conflict-of-interest claim would not be sufficient to establish by clear and convincing evidence that, but for Mr. Manning's alleged conflict of interest arising from his alleged relationship to Mr. Valentine, no reasonable factfinder would have found Mr. Xiong guilty of first-degree murder. The Court therefore finds that Mr. Xiong has not satisfied § 2254(e)(2)(B).

**iii. Section 2254(e)(2) bars a hearing on the merits**

Because Mr. Xiong failed to develop the factual basis of his conflict-of-interest claim in state court, within the meaning of § 2254(e)(2)'s opening clause and he has not met § 2254(e)(2)'s stringent requirements, the AEDPA bars his request for an evidentiary hearing on the merits of that claim. 28 U.S.C. § 2254(e)(2); Ramirez, 596 U.S. at 380-82; Williams, 529 U.S. at 437.

**b. Hearing on cause and prejudice**

Because § 2254(e)(2) applies and bars a hearing on the merits of Mr. Xiong's procedurally defaulted conflict-of-interest claim, the Court finds that it would serve no purpose to hold an evidentiary hearing to assess cause and prejudice. See Twyford, 596 U.S. 823 ("[I]f § 2254(e)(2) applies and the prisoner cannot meet the statute's standards for admitting new merits evidence, it serves no purpose to develop such evidence just to assess cause and prejudice.").

**4. Conclusion on the need for an evidentiary hearing**

Having carefully reconsidered the need for an evidentiary hearing on Mr. Xiong's procedurally defaulted conflict-of-interest claim, in compliance with the Tenth Circuit's mandate, the Court reaffirms its prior ruling that Mr. Xiong failed to develop the factual basis of that claim within the meaning of 28 U.S.C. § 2254(e)(2), i.e., that he was "at fault" for the undeveloped record in state court, and that this Court therefore did not err when it denied federal habeas relief as to the procedurally defaulted conflict-of-interest claim without holding an evidentiary hearing on that claim. The Court thus again finds no basis to grant Mr. Xiong relief from the July 2022 judgment under Federal Rule of Civil Procedure Rule 60(b) and denies the Rule 60(b) motion.

Further, because the Court finds that reasonable jurists would not debate the Court's denial of the "true" Rule 60(b) motion to the extent that motion claims that a defect occurred in the federal habeas proceeding when the Court did not hold an evidentiary hearing before denying federal habeas relief on the procedurally defaulted conflict-of-interest claim, the Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253; Slack v. McDaniel, 529 U.S. 473, 484 (discussing standards for issuing a certificate of appealability); Spitznas, 464 F.3d at 1218 (holding that a habeas petitioner is required to obtain a certificate of appealability "to appeal from the denial of a true Rule 60(b) motion in the district court").

**III. Conclusion**

**IT IS THEREFORE ORDERED** that Mr. Xiong's motion to supplement petitioner's post-remand brief (Dkt. # 83) is **granted**.

**IT IS FURTHER ORDERED** that Mr. Xiong's notice to the Court of respondent's failure to file reply brief" (Dkt. # 84) is construed as a motion for summary judgment and is **denied**.

**IT IS FURTHER ORDERED** that Mr. Xiong's motion for appointment of counsel (Dkt. # 89) is **denied**.

**IT IS FURTHER ORDERED** that Mr. Xiong's Rule 60(b) motion (Dkt. # 56) is **denied**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **denied**.

**IT IS FURTHER ORDERED** that a separate judgment shall be entered herewith.

**DATED** this 10th day of September, 2026.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE